*In re* GROSS PRODUCTION TAX OF WOLVERINE OIL CO.

No. 7426.  Opinion Filed October 12, 1915.

Rehearing Denied January 17, 1916.

(154 Pac. 362.)

1.  **COURTS—Jurisdiction of Supreme Court—Taxation.** The only questions properly determinable by this court in the exercise of the exclusive and original jurisdiction conferred by Act March 11, 1915 (Laws 1915, c. 107, art. 2, subd. A) sec. 1, are those involved in an action instituted to determine the validity of the act, and not those that may arise in the administration of the law, or that concern the application or distribution of the revenues collected.

2.  **LICENSES—Petroleum Tax—Occupation Tax—Statute—"Property Tax."** The gross production tax imposed by subdivision A of the act of March 11, 1915, is not a property tax, but, instead, is a tax on the business or occupation named therein, the amount of which is determined by the value of the gross production of petroleum and other commodities named, produced during the last preceding quarter annual period. Such tax the Legislature may provide for by section 12, art. 10, of the Constitution.

3.  **TAXATION—Occupation Tax—Exemption—Nature of Statute.** That portion of the act which provides that the tax levied shall be "in lieu of any other taxes that might be levied and collected upon an **ad valorem** basis upon the equipment and machinery in and around any well producing natural gas or petroleum or other mineral oil, and used in actual operation of such producing well from which a gross production tax is collected as herein provided," is not an exemption from taxation as prohibited in sections 46, 46U, 50, art. 5, of the state Constitution, but a substitution of one form of taxation for another upon the conditions named in the act.

4.　**TAXATION—Subjects of Taxation—Selection by Legislature—Power.** Section 13, art. 10, of the Constitution gives to the Legislature authority to select the subjects of taxation.

5.　**TAXATION—Classification of Subjects—Reasonableness.** The power of the Legislature to distinguish, select, and classify subjects of taxation has a wide range of discretion. While the classification must be reasonable, and not arbitrary, there is no precise application of the rule of reasonableness, and there cannot be an exact exclusion or inclusion of persons or things. This right is expressly recognized in section 22, art. 10, of the Constitution, which provides that nothing therein shall be held or construed to prevent the classification of property for purposes of taxation and the valuation of different classes by different means or methods.

6.　**TAXATION — Classification — Review by Courts.** To justify judicial interference, the right to classify being a legislative function, the classification adopted must be based on an invidious and unreasonable distinction with reference to the subject of the tax. Unless this appears, the court will not declare the classification void, though it may not approve its terms, or may question the wisdom of its enactment.

7.　**TAXATION—Uniformity—Gross Production Tax.** The act imposing a gross production tax equal to one-half of 1 **per centum** of the gross value of ores bearing lead, zinc, jack, gold, silver, or copper, or asphalt, 2 **per centum** of the gross value of the production of petroleum or other mineral oil or natural gas, and which omits to impose such production tax on coal, is not repugnant to section 5, art. 10, of the Constitution, providing that taxes shall be uniform upon the same class of subjects.

8.　**TAXATION—Uniformity—Production Tax.** The imposition of a gross production tax, based on the gross value of the production of petroleum or other mineral oil or natural gas, as provided by section 1 of subdivision A of the act of March 11, 1915, but which provides that, whenever the mining of said commodity is so carried on and conducted through a federal agency, the state has no authority to impose and collect therefrom such tax, and provides that property of those so engaged shall be taxed on an **ad valorem** basis, and not be subject to the gross production tax provided to be levied in the act, is not in conflict with section 5, art. 10, of the Constitution, requiring that taxes shall be uniform upon the same class of subjects.

9.　**TAXATION—Production Tax—Validity of Statute—Ad Valorem Tax.** The production tax imposed by the act not being an **ad valorem** tax on property, the statute is not repugnant to section 8, art. 10, of the Constitution, requiring that all property which

may be taxed **ad valorem** shall be assessed for taxation at its fair cash value, estimated at the price it would bring at a fair and voluntary sale.

10. **TAXATION—Statute Imposing Tax—Statement of Purpose—Gross Production Tax.** The act sufficiently states the purpose of the tax levy, and is not, therefore, repugnant to the provisions of section 19, art. 10, of the Constitution, requiring that every law enacted by the Legislature levying a tax shall specify distinctly the purpose for which the tax is levied.

11. **CONSTITUTIONAL LAW—Uniformity of Taxation—Equal Protection.** The provision of the Fourteenth Amendment to the Constitution of the United States that no state shall deny to any person the equal protection of the law does not prevent a state, in the exercise of its sovereign right, from adjusting its system of taxation in all proper and reasonable ways, nor compel the states to adopt an invariable rule of uniform taxation. The amendment intends only that the equal protection and security shall be given to all under like circumstances, and that no greater burdens should be laid upon one than are laid upon others in the same situation.

(Syllabus by the Court.)

Original action between the State Board of Equalization and E. B. Howard, as State Auditor, and the Wolverine Oil Company, to determine the validity of portions of the act of March 11, 1915, as provided for by said act, and pursuant to section 5303, Rev. Laws 1910. Validity affirmed.

*Ames, Chambers, Lowe & Richardson,* for Wolverine Oil Company.

*Sherman, Veasey & Davidson, Rice & Lyons, Carroll & Mason, A. A. Richards, Randolph, Haver & Shirk, E. H. Chandler, C. W. Grimes, John M. Chick,* and *C. C. Magee, amici curiae.*

*S. P. Freeling,* Atty. Gen., and *Smith C. Matson,* and *J. H. Miley,* Asst. Attys. Gen., for the State Board of Equalization and E. B. Howard, State Auditor.

SHARP, J. The importance of the legal questions presented by the present controversy is readily apparent, when it is known that there is involved many provisions of the state Constitution, both conferring power and containing limitations upon the Legislature in the exercise of the taxing power of the state; also the right of the state constitutionally to impose taxes of certain kinds, due to the fact that a considerable portion of the oil and gas production of the state is carried on through the instrumentality of a federal agency; also there is presented the question whether the tax levy denies to the producers, or certain of them, the equal protection of the laws of the state, which the Fourteenth Amendment to the federal Constitution guarantees shall not be abridged by state action. The portions of the act the constitutional validity of which is attacked will appear throughout the course of the opinion. Many of the legal questions presented are new in the jurisprudence of the state, and are somewhat difficult in their application to the anomalous conditions under which the oil and gas industry in the state is carried on.

The nature and character of the tax provided for in section 7464, Rev. Laws 1910, as amended by section 1, art. 2, subd. A, of the act of March 11, 1915 (1915 Sess. Laws, pp. 150-153), first demands our attention; for upon a proper construction of the statute in the particulars named must largely rest our conclusions. Section 7464 does not materially differ from section 6 of the act of May 26, 1908 (Laws 1908, c. 71, art. 2), authorizing the levy and collection of a gross revenue tax from persons, firms, corporations, or associations engaged in the production of petroleum or other mineral oil, or natural gas, and which act was amended by act March 27, 1909 (Laws

1909, c. 38, art. 2), sec. 1. Construing the amended statute in *McAlester-Edwards Coal Co. et al. v. Trapp,* 43 Okla. 510, 141 Pac. 794, it was held that the tax intended to be assessed and collected thereby was upon the value of the property owned by plaintiffs, and not upon the agency or the means used by the federal government in its intercourse and dealings with the Indian tribes. The same conclusion was reached by the District Court of the United States for the Eastern District of the state, in *Choctaw, O. & G. R. Co. v. Harrison,* not reported. A different result was arrived at by the District Court for the Western District in *Missouri, K. & T. Ry. Co. v. Meyer,* 204 Fed. 140, where it was said, under the facts in that case, that the tax imposed was in effect a tax upon the business of mining. From the decision of Judge Campbell in the Harrison Case an appeal was prosecuted direct to the Supreme Court of the United States, where the judgment of the trial court was reversed, and it was said that the act, in effect, prescribed an occupation tax. *Choctaw, O. & G. R. Co. v. Harrison,* 235 U. S. 292, 35 Sup. Ct. 27, 59 L. Ed. 234. Section 6 of the act of May 26, 1908, having thus been construed and characterized as being an occupation tax, and not a tax on property as such, it becomes important to note wherein the act under review differs from the one condemned. In the beginning of the amendment to section 7464, *supra,* it is provided that:

"For the purpose of estimating the value of any property rights attached to or inherent in the right to mineral in this state after the same is segregated from the ore in place, and in lieu of any other method of taxing the same and in lieu of any other taxes that might be levied and collected upon an *ad valorem* basis upon the equipment and machinery in and around any, well produc-

ing natural gas or petroleum or other mineral oil and used in actual operation of such producing well from which a gross production tax is collected, as herein provided (but oil or other mineral if on hand for more than thirty days at tax rendering period shall be taxed *ad valorem* in the taxing district where situated).   *   *   *"

This provision is not contained in the original act. Under the latter act the tax is designated as a "gross production" tax, while under the former it is referred to as a "gross revenue" tax, and is payable to the State Auditor, and not to the State Treasurer, as was formerly the case. The original act (referring to the gross revenue tax) provided that it should be in addition to the taxes levied and collected upon an *ad valorem* basis upon such mining, oil, or gas property, and the appurtenances thereunto belonging, equal to one-half of 1 per centum of the gross receipts from the total production of petroleum or other mineral oil, or of natural gas, while the present act provides that the gross production tax payable to the State Auditor shall be equal to 2 per centum of the gross value of the production of petroleum or other mineral oil or natural gas.   The present act also contains the following provisos at the end of amended section 7464, *supra:*

"*   *   * Provided, that any such person, firm, association, or corporation shall at the time of making its report to the State Auditor set out specifically the amount of the royalty, if any, exempt from taxation by law and in computing the said tax shall pay on the actual cash value of the entire gross production, less such exempt royalty; provided further, that wherever the mining of ores bearing lead, zinc, jack, gold, silver or copper or petroleum or other mineral oil, or natural gas, is so carried on and conducted through a federal agency, that the state has no authority to impose and collect therefrom a gross production tax, that as to all such persons, firms,

associations, or corporations engaged in the mining of ores bearing lead, zinc, jack, gold, silver, copper or other mineral oils or natural gas, such property of such person, firm, associations or corporations, including leases when the same are subject to be taxed by the state, shall be taxed on an *ad valorem* basis, and not be subject to the gross production tax, provided to be levied in this act."

It will further be seen that the present statute omits any reference to coal, and fixes the per centum of taxes payable upon the gross value of the minerals named, and of petroleum or of other mineral oil, or of natural gas, and not according to the gross receipts from production.

Looking to the title of the act, under article 2, dealing with the question at hand, the only words indicative of its character are "Special Taxes—Mining Property and Gross Revenue Tax." So we must look elsewhere in the determination of its nature. As already seen, the tax in the body of the act is referred to as a "gross production tax," while under the old act the nature of the tax, according to the language used, was a "gross revenue tax." The use of the word "revenue" in the former, while the latter act uses the word "production," is unimportant. It is further provided in the latter act that oil or other minerals, if on hand for more than 30 days at tax rendering period, shall be taxed *ad valorem* in the taxing district where situated. The fact that the present act makes the tax levied in lieu of any other method of taxing the same does not, of course, of itself, constitute the tax a tax upon the property of those engaged in the production of oil or gas. While the language of the old act, which provided that the gross revenue tax should be in addition to the taxes levied and collected upon an *ad valorem* basis, was referred to by the Supreme Court in the Harrison Case,

the court's characterization of the tax was not made to rest upon that fact. The tax is not levied by assessment or upon estimate of the amount of taxes required to be levied; neither is it on account of property owned on a given day. As was said in the Harrison Case:

"The requirement. is not on account of property owned on a given day, as is the general custom where *ad valorem* taxes are provided for, and as the Oklahoma laws require."

The act also provides that whenever the mining of petroleum or other mineral oil or natural gas is so conducted through a federal agency that the state has no authority to impose and collect therefrom a gross production tax, as to all such persons, firms, associations, or corporations engaged in the mining of ores bearing lead, zinc, jack, gold, silver, copper, or other mineral oils or natural gas, such property of such person, firms, associations, or corporations, including leases when the same are subject to be taxed by the state, shall be taxed on an *ad valorem* basis, and not be subject to the gross production tax provided to be levied by the act. Clearly the act contemplates two kinds of taxation, and not alone a tax on property as such. This fact is emphasized by the provision of the act requiring that oil or gas on hand for more than 30 days days at tax rendering period shall be taxed *ad valorem* in the taxing district where situated, and by the provision that the mining of oil or gas, when carried on and conducted through a federal agency, shall be taxed on an *ad valorem* basis, and not be subject to the gross production tax provided for by the act.

Nor does the history of the legislation and the decision of the Supreme Court in the Harrison Case tend to change our views as to the nature of the act or the inten-

tion of the Legislature in its passage. Shortly prior to the convening of the last Legislature the Supreme Court had decided in the Harrison Case that a federal agency could not be subjected to an occupation or privilege tax by a state; but, on the other hand, the right of the state to levy an *ad valorem* tax on the personal property of such instrumentality was expressly recognized. In fact, this conclusion had already been reached by this court, in *Re Indian Territory Illuminating Oil Co.*, 43 Okla. 307, 142 Pac. 997. This, we think, was precisely what the Legislature by the act in question intended doing and did; that is to say, that an occupation tax should be levied on the kinds of minerals named in the act and upon petroleum or other mineral oil or natural gas, other than where the production was carried on and conducted through a federal agency, and that as to such property, including leases when the same were subject to be taxed by the state, the same should be taxed by the proper taxing authorities on an *ad valorem* basis, at the same time making provision for the deduction of certain exempt royalty. In the present act, as in the old, save as to the production carried on and conducted through a federal agency, the manifest purpose was to reach the gross value of the proceeds, and secure a certain percentage thereof, the same in legal effect as was said by the Supreme Court to be the purpose of the former statute, and which the court said was a method commonly pursued in respect to license and occupation taxes. Referring to sections 2 and 3 of the original act, it was held in *Meyer v. Wells Fargo & Co.*, 223 U. S. 298, 32 Sup. Ct. 218, 56 L. Ed. 445, that there was no warrant for calling the tax a property tax. The tax, other than that provided for when the business is carried on and conducted through a federal agency, is

payable only on the basis of the gross value of the pro-, duction. If there be no production, regardless of the value of the property, no tax is authorized. In short. the tax is one levied on the occupation or business: the standard adopted for the determination of its amount being the value of the gross production of the commodity taxed.

By section 12, art. 10, Constitution, the Legislature was g.ven the power to provide for the levy and collection of various kinds of taxes, including license, franchise, gross revenue, income, and production taxes. That the Legislature acted within its constitutional authority is therefore clear, unless it be made to appear that the act itself is in violation of other provisions of the Constitution. A proper construction of the statute, therefore, as already indicated, authorizes the conclusion that it was the purpose of the Legislature, gathered both from the language employed and from the current history of the times, to levy and collect a tax on the business of producing oil or gas, the amount thereof to be measured by the value of the gross production, where not carried on and conducted through a federal agency, but where such was the case, the property of the person, firms, associations, or corporations engaged in the mining of oil or gas, including leases made the subject of taxation, should be taxed on an *ad valorem* basis under the general taxing laws of the state. Property of the latter character, except oil and gas leases, was, prior to the passage of the act, subject to taxation. Rev. Laws 1910, secs. 7302, 7304, 7305. This, as already seen, was also expressly provided for, both in the act of May 26, 1908, and in the amendment thereto of March 27, 1909. See, also, section 1, subd. A, of the act of March 11, 1915. To those who could not be reached by a tax on the occupation or busi-

ness, by reason of a controlling jurisdiction in the general government, no effort was made to impose or collect such tax.

The taxing power of the state is one of its highest attributes of sovereignty, and its authority to tax all subjects over which its sovereign power extends is undeniable; but it cannot tax the instruments of the federal government, nor the means employed by Congress to carry into effect the powers conferred by the federal Constitution. *Society for Savings v. Coite,* 6 Wall. 594, 18 L. Ed. 897; *Provident Inst. for Savings v. Massachusetts,* 6 Wall. 611, 18 L. Ed. 907. As was held by the Supreme Court, in *McCullough v. Maryland,* 4 Wheat. 316, 4 L. Ed. 579:

"The government of the Union, though limited in its powers, is supreme within its sphere of action; and its laws, made in pursuance of the Constitution, form the supreme law of the land."

Again, in this connection, it was said by Chief Justice Marshall, in *Weston v. Charleston,* 2 Pet. 479, 7 L. Ed. 481, after referring to the court's former opinion in *McCullough v. Maryland:*

" 'All subjects over which the sovereign power of the state extends are objects of taxation; but those over which it does not extend are, upon the soundest principles, exempt from taxation.' 'The sovereignty of a state extends to everything which exists by its own authority, or is introduced by its permission,' but not 'to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States.' "

To these early landmarks in our jurisprudence having to do with the taxing power of the states, we refer that the limitations upon the power of the state may not

be overlooked, and that the fact be made clear that the state, while without authority to impose and collect an occupation tax upon a federal instrumentality acting under congressional authority, is not for that reason deprived of the right to levy and collect such tax upon those engaged in business of the same nature or kind admittedly within its jurisdiction. The fact that the tax is one beyond the power of the state to impose, where the circumstances may establish a federal agency, will not be permitted to embarrass or prevent the sovereign authority of the state lawfully to impose such tax on those not within the federal jurisdiction. To hold otherwise would be a surrender by the state of one of its first and most important functions of government. A case very much in point is that of *State v. Missouri, K. & T. R. Co. of Texas* (Tex. Sup.) 100 S. W. 146. The statute there imposed upon railroads managing a line of railroad in the state for the transportation of passengers, freight, and baggage an annual tax on their gross receipts. The Texas & Pacific Railway Company, a railroad operating in that state, was incorporated under an act of Congress, and not subject to the tax imposed by the act of the Legislature. *State v. Texas & Pacific R. Co.*, 100 Tex. 279, 98 S. W. 834. It was urged by other railroads that the statute was unconstitutional for various reasons, among which was that it was in conflict with section 2 of article 8 of the state Constitution, providing that:

"All occupation taxes shall be equal and uniform upon the same class of subjects within the limits of the authority levying the tax."

It was held that the railway company named did not belong to a class within the authority of the Legislature for the purpose of imposing an occupation tax,

and that the occupation tax on railroads imposed by the statute, levying on railroads doing business in the state a tax on their gross receipts, was not in conflict with said provision of the Constitution. The effect of the decision was to sustain the validity of the act of the Legislature, notwithstanding its inapplicability to one of the principal railroads within the state, upon which the Legislature was without power to levy such tax. Here the statute, operating alike upon all those engaged in the industries named and over which the state could rightfully exercise the authority attempted, and not being discriminatory, within a constitutional meaning, is not repugnant to section 5, art. 10, of the Constitution, requiring that "taxes shall be uniform upon the same class of subjects." The statutes provide that all real property in the state, other than such as is specifically exempted, shall be subject to taxation. Rev. Laws 1910, section 7302; section 1, subd. A, c. 107, Sess. Laws 1915. Yet, notwithstanding the statute, a large amount of land is not taxed and cannot be, by reason of treaty stipulations or agreements containing covenants against taxation made and entered into between the government of the United States and the Indian tribes in the state, and which provisions inure to the benefit of the enrolled tribal members to whom the lands of the tribe were allotted. *Choate v. Trapp,* 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941; *Gleason v. Wood,* 224 U. S. 679, 32 Sup. Ct. 571. 56 L. Ed. 947; *English v. Richardson,* 224 U. S. 680, 32 Sup. Ct. 571, 56 L. Ed. 949. It could not successfully be contended, nor has it to our knowledge ever been claimed, that because of the nontaxability of these lands for the time, other lands of like character, but unrestricted in the matter of exemption from taxation, were not, there-

fore, subject to taxation; and this regardless of both our constitutional inhibitions against exempting property from taxation, and requiring that all taxes shall be uniform upon the same class of subjects.

In the leasing of the lands of the Osage Nation for oil and gas, as well as in the making of such leases on the restricted lands of certain of the allottees of the Five Civilized Tribes, the Department of the Interior, acting pursuant to lawful warrant, has in behalf of these Indians, whom Congress has regarded as dependent, and in need of the government's aid and protection, assumed full and complete jurisdiction and control during the period of dependency. This form of general guardianship is exercised because of the duty owing these dependent people, that the vast oil and gas deposits underneath their lands may be developed and marketed, and those lawfully entitled thereto given the benefit thereof. As was said in the Harrison Case, the instrumentalities made use of by the general government are the lessees of such lands or their duly authorized assignees. More need not be said in this connection, for the question is foreclosed by the opinion in the Harrison Case. The limitation upon the state's power in this regard is expressly recognized by the act itself, and by counsel, who say that the state cannot levy an occupation or privilege tax upon a federal instrumentality acting under congressional authority.

It is urged with much ability that the provision of the act which provides that, "In lieu of any other taxes that might be levied and collected upon an *ad valorem* basis upon the equipment and machinery in and around any well producing natural gas or petroleum or other mineral oil, and used in such actual operation of such producing well, is violative of sections 46, 46u, and 50, art.

5, of the state Constitution, prohibiting the Legislature from passing any law exempting any property within the state from taxation, and that, whether the tax be upon the property as such or upon the occupation or business. The first contention is easily met; for by the terms of the act the property named is not exempt unless a gross production tax is collected as therein provided. If a property tax is collected under the general taxing laws of the state, no gross production tax is levied or collected, unless, possibly, in the case of oil on hand for more than 30 days from tax-rendering period. Hence as to such tax the act does not attempt to exempt equipment and machinery. Such is the clear and unmistakable intent of the act, giving to the language used its plain and commonly accepted meaning.

As to those liable to and who pay a gross production tax, it will be noted that the act does not in terms exempt equipment and machinery, but provide that the payment of the gross production tax shall be in lieu of any other tax that might be levied and collected on said property upon an *ad valorem* basis. This is not an exemption from taxation within the meaning of the constitutional inhibitions, but a substitution of one form of taxation for another upon the terms and conditions named. The equipment and machinery referred to is confined to that used in the actual operation of producing wells, hence does not include equipment and machinery on hand, and not so used. By the act a tax is levied based upon the value of the gross production. This can only arise through the discovery and production of oil or gas. The equipment and machinery owned by the producer, and which is an indispensable agency in the discovery and production of the commodity, forms

a part of the property out of which the production arises. Without it production is impossible. The same is not taxed directly, neither are the lands or leases, where the production is through a lessee.

A very instructive case, and one that gives strong support to our views, is that of *McHenry v. Alford,* 168 U. S. 651, 18 Sup. Ct. 242, 42 L. Ed. 614. There an act of the Dakota Legislature exempted from taxation, other than as provided by the act, lands granted to aid in the construction of the Northern Pacific Railroad, which were outside of the right of way and not used in its business as a common carrier, and provided for the taxation of railroads by percentage of gross earnings in lieu of all other taxes. It was insisted that the lands were simply "property owned by railroad," and not "railroad property," and that, although railroad property might be taxed in a given special method and at a special rate, yet by the term "railroad property" was simply meant property necessary for the use in the usual daily conduct of the business of the company as a common crarier by rail, and that any lands outside of that used, although owned by a railroad company, could not be classified and taxed in any different manner from lands owned by an individual, otherwise such classification would be purely arbitrarily, and the taxation in that way would be illegal; that no earnings arose from those lands, because the earnings upon which the tax was assessed were by the terms of the act restricted to "the gross earnings * * * arising from the operating of said railroad, and such earnings were not created by, nor did they arise from, nor were they in any way connected with, these lands." It was held that at the time these lands were so closely connected with the railroad, its construction and oper-

ation, as, in effect, to be part and parcel thereof; that they made the gross earnings possible, upon the same principle that they partly issued out of the right of way, the roadbed, the track, cars, engines, tanks, and other confessedly ."railroad property." In the course of the opinion it is said:

"Although the act here provides for taxation of the gross earnings arising from the operation of the road, the phrase means earnings which arise because of its operation. The road is in operation, and the earnings which it is thereby enabled to make are to be taxed. Property which the company owns, and which has enabled and continues to enable it to operate its road, is part of the property from which the earnings arise by reason of such operation, and is within the meaning of the act. These lands are of this description. Although they are not taxed directly, yet the same is true of the right of way, the roadbed, the engines, cars, and water tanks, * * * without which the road could not be operated. In substance, it must be said that without the existence of all the various pieces of property just enumerated gross earnings would be quite impossible. It is also true in regard to these lands. * * * And, looking at those facts, we see that unquestionably these lands have indirectly contributed to the gross earnings derived from operating the road, and that such earnings have arisen and been made possible by reason of the lands. They have not only aided in making these gross earnings possible, but they have formed, and still do form, a material fact in the combination of circumstances contributing to the construction of the railroad, to its operation, and to its earnings."

Concerning the right of the Legislature to classify objects of taxation, it may be said the power is one that must be exercised subject to the restrictions of the state Constitution. This power in the Legislature is expressly

recognized in our organic law, and authority given to fix the valuation of different classes by different means or methods (section 22, art. 10), but with the limitation "that taxes shall be uniform upon the same class of subjects" (section 5, art. 10.) It has been said that classification for taxation is not necessarily based upon any essential difference in the nature of the various subjects. It may be based as well upon the want of adaptability to the same methods of taxation, or upon the impracticability of the same methods of taxation, or upon the impracticability of applying to the various subjects the same methods so as to produce just and uniform results, or it may be based upon just and well-grounded considerations of public policy. Judson on Taxation, pp. 563, 564, 592. The power of the state to distinguish, select, and classify objects of taxation has a wide range of discretion. The classificat:on must be reasonable, but there is no precise rule of reasonableness, and there cannot be an exact exclusion or inclusion of persons and things. Cooley on Taxation, pp. 76, 77. The principle thus announced, differing only in the form of expression, was followed in *Pacific Express Co. v. Seibert,* 142 U. S. 351, 12 Sup. Ct. 250, 35 L. Ed. 1035; *Magoun v. Illinois Trust & Savings Bank,* 170 U. S. 296, 18 Sup. Ct. 594, 42 L. Ed. 1037. The rule, however, is not without its limitations, for it is equally well settled that the classification must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis. Is the present act, levying one rate of tax on o'l and gas, and a lesser rate on ores bearing lead, zinc, jack, gold, silver, copper, or asphalt, and which omits a gross production tax on coal, in conflict

with this rule? Clearly it is not. Placing mining property or the business of mining in a class by itself and taxing same by some method peculiarly appropriate to that class is a valid exercise of a constitutional right on the part of the Legislature, and needs the citation of no authorities in its support. Equally well settled is the rule that it is competent for the Legislature to arrange and divide the various subjects of taxation into distinct classes, provided the tax is uniform upon all those belonging to the same class, and upon which it operates. *Commonwealth v. Germania Brewing Co.*, 145 Pa. 83, 22 Atl. 240; *People ex rel. Iron Silver Mining Co. v. Henderson*, 12 Colo. 369, 21 Pac. 144; *People ex rel. Hatch v. Reardon*, 184 N. Y. 431, 77 N. E. 970, 8 L. R. A. (N. S.) 314, 112 Am. St. Rep. 628, 6 Ann. Cas. 515; note to *Bacon v. Board of State Tax Com'rs*, 126 Mich. 22, 85 N. W. 307, 60 L. R. A. 339 *et seq.*, 86 Am. St. Rep. 524; *Glascow v. Rowse*, 43 Mo. 479; *Gatlin v. Tarboro*, 78 N. C. 119; *Metropolitan St. R. Co. v. New York*, 199 U. S. 1, 47, 25 Sup. Ct. 705, 50 L. Ed. 65, 4 Ann. Cas. 381.

To justify judicial interference, the right to classify being a legislative function, the classification adopted must be based on an invidious and unreasonable distinction or difference with reference to the subject of the tax. Unless this appears, the courts will not declare the classification void, though it may not meet their approval. There are, in fact, many good reasons for making the classification adopted by the Legislature. The nature and character of oil and gas, their relation one to the other in the natural state, means of discovery, kind of labor employed, and cost of production and marketing furnish good and sufficient reasons for the levy of a

tax greater in amount than a tax of a like character placed on lead, zinc, and the other mineral ores named in the act. Nor does the omission of coal from the imposition of a production tax affect the statute. It should be kept in mind that the tax is not upon the property, but, instead, upon the business or occupation. Producers of oil and gas in the state are not, therefore, arbitrarily discriminated against, contrary to the uniformity clause of the Constitution, by the tax imposed upon the value of their gross production, because it does not include the production of all minerals, or because those which it does include are not taxed at the same rate. In the Ohio Tax Cases (*Ohio River & Western R. Co. v. Dittey et al.*, 232 U. S. 586, 34 Sup. Ct. 372, 58 L. Ed. 737) it was urged that the act of the Ohio Legislature arbitrarily discriminated against the plaintiffs in error and other railroad companies, in that it did not include all other public utilities carrying on business within the state, those omitted, it was said, being grain elevators, stockyards, ferries, bridge companies, and innkeepers, and in that the law did not operate uniformly among the utilities that were taxed, since on electric light, gas, natural gas, waterworks, telephone, messenger or signal, union depot, heating, coaling, and water transportation companies the tax amounted to 1.2 per cent. of gross intrastate receipts, as to suburban and interurban railroads it was fixed at 1.2 per cent. of gross intrastate earnings, and on express and telephone companies it was 2 per cent., while on railroads, including plaintiffs in error, it was 4 per cent. of such earnings, and the same on pipe line companies. With regard to the contention that the statute violated both the "uniformity" clause of the state Constitution

and the "equal protection" clause of the Fourteenth Amendment, the opinion reads:

"Both of these contentions turn upon the familiar question of classification, concerning which so much has been written. We agree with the court below that whether the question be considered in view of the uniformity and equality provisions of the Ohio Constitution, or the 'equal protection' clause of the Fourteenth Amendment, the result is the same; it cannot be said that the classification rests upon no reasonable and sufficient basis of distinction. *State ex rel. Taylor v. Guilbert*, 70 Ohio St. 253, 71 N. E. 636, 1 Ann. Cas. 25; *Kentucky R. Tax Cases*, 115 U. S. 321, 337, 6 Sup. Ct. 57, 29 L. Ed. 414, 419; *Bell's Gap R. Co. v. Pennsylvania*, 134 U. S. 232, 237, 10 Sup. Ct. 533, 33 L. Ed. 892, 895; *Magoun v. Illinois Trust & Sav. Bank*, 170 U. S. 283, 293, 18 Sup. Ct. 594, 42 L. Ed. 1037, 1042; *Southwestern Oil Co. v. Texas*, 217 U. S. 114, 121, *et seq.*, 30 Sup. Ct. 496, 54 L. Ed. 688, 692."

Again, in the course of the opinion, it was said that the tax was, in substance as well as in form, an excise or privilege tax; that its reasonableness, unless some federal right be violated, was within the discretion of the state Legislature; that it had already been seen that the classification adopted could not be deemed illusory; that is, that there was no apparent violation of the equality provisions of the state Constitution, or of the "equal protection" clause of the Fourteenth Amendment, although railroad and pipe line companies were required to pay at the rate of 4 per cent. of their annual intrastate earnings, while other public service corporations paid a less percentage. Authorities in harmony with those cited are numerous. Among them are *Connolly v. Union Sewer Pipe Co.*, 184 U. S. 540, 562, 22 Sup. Ct. 431, 46 L. Ed. 679; *Armour Packing Co. v. Lacy*, 200 U. S. 226, 235, 26

Sup. Ct. 232, 50 L. Ed. 451; *People ex rel. Hatch v. Reardon, supra; Braum et al. v. Chicago,* 110 Ill. 186; *Maine v. Western U. Tel. Co.,* 73 Me. 518. The principles of equality and uniformity do not require the equal taxation of all pursuits or classes of business, nor prevent the Legislature from taxing some kinds of business, while omitting others; but only that the burden of taxation shall be imposed equally upon all those engaged in the same avocation, or, as provided by our Constitution, "upon the same class of subjects." *Rhinehart v. State,* 121 Tenn. 420, 117 S. W. 508, 17 Ann. Cas. 254; *State v. Galveston, H. & S. R. Co.,* 100 Tex. 157, 97 S. W. 71; *Kehrer v. Stewart,* 197 U. S. 60, 25 Sup. Ct. 403, 47 L. Ed. 663; *Kittanning Coal Co. v. Commonwealth,* 79 Pa. 100; 37 Cyc. 732. A rule requiring that all kinds of business be included within some class made the subject of taxation as authorized in section 12, art. 10, of the Constitution, would deprive the state of its right to select its subjects of taxation and be in violation of section 13, art. 10, of the Constitution.

The objection is made that the act is in violation of section 19, art. 10, Constitution, in that, being an act levying a tax, it fails to specify distinctly the purpose for which the tax is levied. The act is not an exercise of the police power, but is, instead, a revenue measure. *Binion v. Oklahoma Gas & Electric Co.,* 28 Okla. 356, 114 Pac. 1096. Section 19 of article 10 is identical with section 180 of the Constitution of Kentucky 1891, except that the latter has an additional provision giving to the, General Assembly the power to authorize counties, cities, or towns to levy a poll tax; in fact, it is said that the above provision of our Constitution was taken from the Kentucky Constitution. This provision of our Consti-

tution was before the court in *McGannon, Adm'x, v. Trapp, Auditor,* 33 Okla. 145, 124 Pac. 1063, Ann. Cas. 1914B, 620, where it was held that it did not apply to the act of May 26, 1908, imposing an inheritance tax upon the transfer of property, but applied only to annually recurring taxes.

The construction of the constitutional provision before us has frequently been before the court of last resort of Kentucky. In *Commonwealth et al. v. United States F. & G. Co.,* 121 Ky. 409, 89 S. W. 251, the order of the fiscal court of Taylor county levying a tax for the year 1901 wholly omitted to state the purpose for which the tax was levied, and the order was held to be void. In *Chesapeake, O. & S. W. R. Co. v. Commonwealth,* 129 Ky. 318, 108 S. W. 248, 111 S. W. 334, 33 Ky. Law Rep. 882, the order of the fiscal court levied a tax, but failed to designate the purpose for which it was levied, and it was likewise held invalid. To the same effect are *Somerset v. Somerset Banking Co.,* 109 Ky. 549, 60 S. W. 5; *United States Fidelity Co. v. Board of Education,* 118 Ky. 355, 80 S. W. 1191; *Morrell Refrigerator Car Co. v. Commonwealth,* 128 Ky. 447, 108 S. W. 926, 32 Ky. Law Rep. 1389. In *Pulaski County v. Watson,* 106 Ky. 500, 50 S. W. 861, it was ordered that the sheriff of Pulaski county for the year 1894 be directed to collect 25 cents on each $100 of the taxable property reported by the assessor for said year, and pay same to the county treasurer, in accordance with the law, for the purpose of paying claims against the county. The order was held sufficient. In *McInery v. Huelfield,* 116 Ky. 28, 75 S. W. 237, the resolution of the fiscal court levied a tax of 38 cents on the $100, which recited that it was apportioned as follows:

"Three cents for the purpose of creating a sinking fund with which to purchase a poor farm and erect suitable buildings thereon, 10 cents for the maintenance and repair of the public roads and bridges of the county, and 25 cents to defray the general county expenses."

And it was held that the resolution satisfied the purposes of the levy with sufficient distinctness. In *Mt. Pleasant v. Eversole*, 96 S. W. 478, 29 Ky. Law Rep. 830, it was held that the ordinance of a town out of debt levying a property tax "for municipal purposes  *  *  *." sufficiently specified the purpose for which the tax was levied, within the provisions of section 180 of the Constitution, requiring an ordinance imposing a tax to specify distinctly the purpose for which the same was levied.

In *Meyer et al. v. Lynde-Bowman-Darby Co.*, 35 Okla. 480, 130 Pac. 548, the act providing for a graduated tax on land holdings did not specify distinctly or otherwise the purpose for which the tax was levied, and was therefore held to be void.

Turning to the act in question, we find that in section 4 it is provided that all gross production revenues collected by the State Auditor under the provisions of the act shall be paid into the state treasury—

" *  *  *  one-half to be credited to the general revenue fund of the state, and applied to the current expense of the state government (and any unexpected balance at the close of each fiscal year shall be credited to the common school fund of the state  *  *  *  as are other common school funds) ; the remaining one-half shall be, by the State Treasurer distributed to the county treasurer of the counties from whence the same was collected, in proportion to the school enumeration of such counties, and the same shall be distributed in aid of common schools of such counties upon a *per capita* basis as are other common school funds."

The act contains a further section that, if for any reason the provisions of section 4 may prove ineffective, then at once shall the proceeds of all gross production tax collected pursuant to the act be paid into the general revenue funds of the state, and be applied to the current expenses of the state government, and that any unexpended balance at the end of each fiscal year shall be credited to the common school fund of the state, to be distributed as are other common school funds of the state. We have seen, therefore, that the primary object of the act was to levy a tax, one-half of which should go into the general revenue fund of the state, the remaining one-half to be distributed to the counties from whence the tax was collected, in the proportion named; same to be distributed in aid of the common school funds of such counties. But, if the latter provision could not be made effective, then the entire proceeds of the tax collected should be applied to defray the ordinary expenses of the state; any unexpended balance at the end of each fiscal year to be credited to the common school fund of the state.

But it is urged that the revenue collected is to be used in a manner contrary to the provisions of the Constitution; hence the purpose of the act is unlawful. The purposes for which the tax was imposed we have already seen. Generally speaking, it is the duty of the Legislature to provide for the levy of taxes to defray the expenses of the state government. The Legislature has also the power, under certain limitations, to levy a state tax in aid of the public schools. *Atchison, T. & S. F. Ry. Co. v. State,* 28 Okla. 94, 113 Pac. 921, 40 L. R. A. (N. S.) 1; *Thurston v. Caldwell,* 40 Okla. 206, 137 Pac. 683. In its broadest sense, therefore, the purpose for

which the tax is levied is not an unlawful one. Whether the tax collected should be credited and distributed under sections 4 and 4B of the statute is not a material issue in the determination of the present proceedings. It involves a question of the distr.bution of the revenue collected when the same reaches the State Treasurer. By the express language of the act, this court is given exclusive and original jurisdiction of any and all suits instituted to determine the validity of the act, and not to pass upon all questions arising out of its administration by the executive officers of the state. As to whether the revenues collected and received by the State Treasurer should be credited and distributed under sections 4 or 4B of the act, and the effect of the statute making oil on hand for more than 30 days at tax rendering period liable to an *ad valorem* tax, it is proper to call attention to article 3 of the statute, which provides that:

"The invalidity of any section, subd.vision, clause, or sentence of this act, shall not in any manner affect the validity of the remaining portion thereof."

It is urged that one part of the statute cannot be declared void and leave any part in force, unless the statute is so composite, consisting of such separable parts, that, when the void part is eliminated, another living tangible part remains, capable by its own terms of being carried into effect, consistently with the intent of the Legislature which enacted it in connection with the void part. A number of authorities are cited which announce the foregoing rule, and among which is that of *Meyer v. Wells Fargo Co.*, 223 U. S. 298, 32 Sup. Ct. 218, 56 L. Ed. 445. The latter case was an appeal from the Circuit Court of the United States for the Western District of Oklahoma to review a decree enjoining the collection of

a tax upon the gross receipts of a nonresident express company, and it was said that the act could not be upheld without being so remodeled that it would be a mere speculation whether the Legislature would have passed it in the new form. Generally, it may be said that the fact of one section or provision of an act being unconstitutional and void does not necessarily render the entire statute or enactment void; that, if the act can be given operation and effect without such void provision, the valid portions of it will be allowed to stand, unless the court is unable to say or to know that the Legislature would have passed the act without the void provision. Statutes similar in their working to section 3 of the act have on several occasions been before the courts, and in each instance to which our attention has been called have been upheld, though not always without limitations upon the extent to which they should be allowed to control the courts in passing upon the validity of the statutes. In *State ex rel. Clarke v. Carter*, 174 Ala. 266, 56 South. 974, a section of the act provided that, if any of its provisions should be held void, it should not affect any other section or provision of the act. It was said by the court that, by reason of such provision, it was relieved of any doubt as to the legislative intent. In *State ex rel. Crumpton v. Montgomery*, 177 Ala. 212, 59 South. 294, it was held not within legislative competency to bind the courts by any declaration or pronouncement in their unfettered functions of determining the constitutional validity of enactments. But it was said that the court did not doubt that it was within legislative competency to remove by express assertion in the act any uncertainty in the judicial mind as to what the Legislature would have done in respect to the adoption of the act, with the invalid

parts thereof stricken therefrom before passage. In *Borgnis v. Falk Co.*, 147 Wis. 327, 133 N. W. 209, 37 L. R. A. (N. S.) 489, it was said that the court knew of no good reason why the Legislature might not declare its intention that one part or section of the law is not a compensation for, and that it may be separated from, the balance of the act, for the very purpose of saving such balance from being invalidated in case the first named part or section be held unconstitutional. In *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 Pac. 1101, 1114, 37 L. R. A. (N. S.) 466, it was held that by section 27 of the act the Legislature made clear that it did not intend the provisions relating to those who were entitled to partake of its benefits to be so far an integral part of the act that they could not be eliminated in part without destroying the act in its entirety. Referring to this section, it was said:

"It is there expressly provided that the adjudication of invalidity of any part of the act shall not affect the validity of the act as a whole or any other part thereof. This means that the Legislature intended the act to be enforced as far as it may be, even though it might not be valid in its entirety. It was competent for the Legislature so to provide."

In *Ex parte Schuler*, 167 Cal. 282, 139 Pac. 685, Ann. Cas. 1915C, 706, a section of the statute in question provided that, if any part of the act should be declared unconstitutional, the Legislature intended to pass the statute without that part. And it was said that such statutes imposed upon the courts the duty of supporting the legislative will as far as possible. But, the question not going to, or at least not necessarily going to, the validity of the act, we refrain from the expression of any further opinion involving the law's administration; this be-

cause of the limitation upon our jurisdiction in an original suit. The tax not being an *ad valorem* tax on property, the statute imposing it is not in conflict with section 8, art. 10, of the Constitution, requiring that all property which may be taxed *ad valorem* shall be assessed for taxation at its fair cash value, estimated at the price it would bring at a fair and voluntary sale.

It is urged that the act in question violated the requirements of uniformity of taxation prescribed by the state Constitution, and thereby denies to the Wolverine Oil Company and others similarly situated the equal protection of the laws of the state which the Fourteenth Amendment of the federal Constitution guarantees shall not be abridged by state action. We may here observe that it cannot be denied that the state, keeping within the limits of its own fundamental law, can adopt any system of taxation or classification that it deems best for the common good and the maintenance of its government, provided such classification be not in violation of the Fourteenth Amendment. Such is the demand and right of the states in their relation to the general government, as recognized by the federal courts. In *Bell's Gap R. Co. v. Pennsylvania,* 134 U. S. 232, 10 Sup. Ct. 533, 33 L. Ed. 892, a case often cited, the question arose as to whether a statute of Pennsylvania subjecting bonds and other securities issued by corporations to a higher rate of taxation than was imposed on other monied securities was a denial of the equal protection of the laws to corporations. The contention was met by Mr. Justice Bradley, who held that there was no distinction which the state was not competent to make, saying:

"All corporate securities are subject to the same regulations. The provision in the Fourteenth Amend-

ment that no state shall deny to any person within its jurisdiction the equal protection of the laws was not intended to prevent a state from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, except certain classes of property from any taxation at all, such as churches, libraries, and the property of charitable institutions. It may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products; it may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness or not allow them. All such regulations, and those of like character,, so long as they proceed within reasonable limits and general usage are within the discretion of the state Legislature, or the people of the state in framing their Constitution."

Again, in *Home Ins. Co. v. New York,* 134 U. S. 594, 10 Sup. Ct. 593, 33 L. Ed. 1025, the question was the constitutional validity of a law taxing corporate franchises and business. The court held that the statute was not a denial of the equal protection of the laws. It said that:

The amendment "does not prevent the classification of property for taxation—subjecting one kind of property to one rate of taxation, and another kind of property to a different rate—distinguishing between franchises, licenses, and privileges, and visible and tangible property, and between real and personal property."

In *Connolly v. Union Sewer Pipe Co., supra,* it was held that a tax could be imposed only upon certain callings and trades; for, when the state exerts its power to tax, it is not bound to tax all pursuits or all property that may be legitimately taxed for governmental purposes. In *Kentucky R. Tax Cases,* 115 U. S. 321, 337, 6 Sup. Ct. 57, 29 L. Ed. 414, 419, the court sustained, as not inconsistent with the "equal protection" clause of the Four-

teenth Amendment, the Kentucky statute providing for the assessment of railroad property for purposes of taxation in a mode different from that prescribed as to ordinary real estate, or as to the property of corporations chartered for other purposes, such as bridge, mining, street railway, manufacturing, gas, and water companies. The court said that:

"The rule of equality in respect to the subject only requires the same means and methods to be applied impartially to all the constituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances. There is no objection, therefore, to the discrimination made as between railroad companies and the other corporations in the methods and instrumentalities by which the value of their property is ascertained."

In *Delaware R. Co. Tax,* 18 Wall. 206, 231, 21 L. Ed. 888, 896, it was said that :

"It is not for us to suggest in any case that a more equitable mode of assessment or rate of taxation might be adopted than the one prescribed by the Legislature of the state. Our only concern is with the validity of the tax; all else lies beyond the domain of our jurisdiction."

In *Pacific Express Co. v. Seibert,* 142 U. S. 339, 12 Sup. Ct. 250, 35 L. Ed. 1035, it was held that the Fourteenth Amendment of the United States Constitution did not prevent the state from adjusting its system of taxation in all proper and reasonable ways, nor the classification of property for taxation; that the Missouri statute imposing a tax upon the business of express companies was not repugnant to the Fourteenth Amendment because it did not impose a like tax upon railroad or steamboat companies which carried express matter. In *Southwestern Oil Co. v. Texas,* 217 U. S. 114, 30 Sup. Ct. 496,

54 L. Ed. 688, one of the last expressions of the Supreme Court on the subject at hand, it is said by Mr. Justice Harlan:

"But we will not speculate as to the motives of the state, and will assume—the statute, either upon its face or by its necessary operation, not suggesting a contrary assumption—that the state has by good faith sought, by its legislation, to protect or to promote the interests of its people. It is sufficient for the disposition of this case to say that, except as restrained by its own Constitution or by the Constitution of the United States, the State of Texas, by its Legislature, has full power to prescribe any system of taxation which, in its judgment, is best or necessary for its people and government; that, so far as the power of the United States is concerned, the state has the right, by any rule it deems proper, to classify persons or businesses for the purposes of taxation, subject to the condition that such classification shall not be in violation of the Constitution of the United States."

It was held that the statute requiring that all wholesale dealers in specified articles should pay a tax of a given amount on their occupation, without exacting a similar tax on wholesale dealers in other articles, could not, on the face of the statute, or by reason of any facts within the judicial knowledge of the court, be held, within the meaning of the Fourteenth Amendment, to deprive the taxpayer of his property without due process of law, and to deny him equal protection of the laws, and that the federal court could not interfere with the enforcement of the statute simply because it might disapprove its terms or question the wisdom of its enactment, or because it could not be sure as to the precise reasons inducing the state to enact it.

These opinions are but a few of the many expressions by the Supreme Court of the United States as to the

power of the state in the passage of laws imposing or providing for the imposition of taxes. Having seen, by the terms of the act, that there is nothing unreasonable or invidious in the selection of the subjects of taxation, or in the classification thereof according to the Constitution of the state, and following the rule announced by the Supreme Court, we may fairly conclude that no rights of the producing companies vouchsafed by the federal Constitution have been denied, or in any wise impaired, by the provisions of the statute in question or the collection of the tax thereby imposed.

This disposes of the principal contentions, and all we feel that go to the constitutionality or involve the validity of that part of the act in question. There are, however, a number of other questions of minor importance presented, but which have to do principally with the administration of the law. These should not be difficult of solution in the light of our conclusions. It would seem that all taxes illegally collected and held by the State Auditor, if such there be, should at once be repaid to those who paid such taxes, either in whole or in part, according to the facts. All taxes lawfully collected will, of course, be paid into the state treasury. The matter of the collection of an *ad valorem* tax is one for the proper taxing authorities.

All the Justices concur.