INDIANA DEPARTMENT OF STATE REVENUE, GROSS
INCOME TAX DIVISION *v*. BENDIX AVIATION
CORPORATION.

[No. 29,458.   Filed June 5, 1957.   Rehearing denied
September 9, 1957.]

*Edwin K. Steers,* Attorney General, *Carl M. Frances-*

chini, *John Z. Kepler* and *Fred Steinhauer*, Deputy Attorneys General, for appellant.

*Richey W. Whitesell*, of Chicago, Illinois, *Crumpacker, May, Beamer, Levy & Searer, George N. Beamer, Nathan Levy* and *James Oberfell*, all of South Bend, for appellee.

ARTERBURN, C. J.—This action was commenced by appellee, Bendix Aviation Corporation, pursuant to the provisions of Acts 1947, ch. 370, §3, p. 1471, being § 64-2614, Burns' 1951 Replacement, for the purpose of obtaining a refund of gross income and bonus taxes, paid under protest, for the taxable years 1951 through September, 1953 (on fiscal year basis). The trial court entered judgment for appellee in the sum of $546,734.64 as taxes, and interest of $55,587.57 thereon, making a total judgment of $602,322.21.

The case was tried upon a stipulation of facts. Alleged error is presented by the Indiana Department of State Revenue, appellant, by way of a motion for new trial, alleging that the decision of the trial court was not sustained by sufficient evidence, and was contrary to law.

The appellee is a Delaware corporation qualified and admitted to do business in the State of Indiana. It maintains offices and two manufacturing plants in St. Joseph County, in the State of Indiana. The appellee, during the period in question, received gross income from the United States Government and from its prime contractors on certain government contracts. These contracts provided for the manufacture by the appellee of certain articles needed for the Armed Forces. It is appellee's contention that the receipts from all of these

contracts are not subject to the gross income and bonus taxes of the State of Indiana for the reason that the State is prohibited from taxing such transactions under the Commerce Clause (Art. 1, §8, Cl. 3), of the United States Constitution.[1]

The Gross Income Tax Law of the State of Indiana insofar as applicable here, provides in Section 2 thereof, as follows:

"There is hereby imposed a tax upon the receipt of gross income, measured by the number or volume of gross income, and in the amount to be determined by the application of rates on such gross income as hereinafter provided. Such tax shall be levied upon the receipt of the entire gross income of all persons resident and/or domiciled in the state of Indiana, except as herein otherwise provided; and upon the receipt of gross income derived from activities or businesses or any other source within the state of Indiana, of all persons who are not residents of the state of Indiana, . . . ." Acts of 1937, ch. 117, §2, p. 604, being §64-2602 Burns' 1951 Replacement.

It also provides as follows:

"There shall be excepted from the gross income taxable under this act [§§64-2601—64-2631]:

"(a) So much of such gross income as is derived from business conducted in commerce between this state and other states of the United States, or between this state and foreign countries, but only to the extent to which the state of Indiana is prohibited from taxing such gross income by the Constitution of the United States of America. . . ."

---

1. The appellant makes no contention that an exemption from the tax exists merely because the government is a party to the contract. No law is suggested which gives a contractor with either the state or federal government an exemption from payment of an income tax levied on proceeds from such contracts by the other government. *State of Alabama* v. *King & Boozer* (1941), 314 U. S. 1, 86 L. Ed. 3, 62 S. Ct. 43, 140 A. L. R. 615.

Acts 1945, ch. 143, §2, p. 311, being §64-2606 Burns' 1951 Replacement.

The tenor of appellee's argument seems to be founded upon the premise that if the tax is applicable to any phase of interstate commerce it is *per se* invalid. We are not prepared to accept this proposition *in toto*. We find no such inflexible rule has been laid down.

Before the adoption of the Federal Constitution the States possessed the power to tax without restraint or interference. The several States still retain and reserve this very necessary power except insofar as it is limited or restricted by the United States Constitution. We are concerned here with only one of those provisions in that Constitution, namely, the power granted to Congress "to regulate commerce with foreign nations, and among the several States . . ." Art. 1, §8, Cl. 3, United States Constitution. This provision, it should be noted, does not *in terms prohibit* the States in the full exercise of their taxing, police, or other reserved powers; however, although these words are permissive in character to Congress as distinguished from prohibitive to the States, the interpretive language of the Supreme Court of the United States has given them a meaning which limits the several States in their taxing power in some instances. The delineation of this field within which the States may not encroach, and on the other hand, beyond which Congress may not wander, is not as distinct nor as clear as one might desire. *Freeman* v. *Hewit* (1946), 329 U. S. 249, 91 L. Ed. 265, 67 S. Ct. 274. Yet, under this rather simply worded grant of power to Congress, the States cannot be deprived of their inherent and reserved taxing power, and on the other hand, they cannot by the exercise of the taxing power interfere with the con-

gressional regulatory power over commerce among the several states.[2]

The only basis for limiting a sovereign State's taxing power under the issues raised here, is that it would interfere with the regulatory powers of Congress over commerce among the States. If there is no interference, and commerce is unimpeded, there is no warrant or authority for holding that the Commerce Clause in the Constitution of the United States makes a State's taxing laws invalid. To hold otherwise, is to create a fictitious assumption, rather than accept the realities and practicalities of the situation.

In the case of *International H. Co.* v. *Dept. of Treasury* (1944), 322 U. S. 340, 88 L. Ed. 1313, 1316, 1317, 64 S. Ct. 1019, 1021, 1030, the Supreme Court said in this connection:

---

2. The United States Supreme Court has not offered a very dependable guide in this area. In a 5-4 decision (Freeman v. Hewit (1946), 329 U. S. 249, 91 L. Ed. 265, 67 S. Ct. 274), a majority of the court held the Indiana tax on a sale of intangibles by a broker across the State line to be invalid because it was a "direct" tax; that it was irrelevant whether or not the tax was in reality any "burden" on interstate commerce.

The dissenting opinions of the other four justices held in substance such a tax did not impede or interfere with constitutional regulatory power of Congress, and that all commerce was treated alike.

Of the original membership of the court participating in the decision there remain on the present court two members on each side of this issue. The *then* majority of the court apparently abandoned any attempt at being consistent with the past or offering any guidepost for the future when it said, (Frankfurter, J.) on page 252 at 329 U. S., 271 of 91 L. Ed.:

"To attempt to harmonize all that has been said in the past would neither clarify what has gone before nor guide the future. Suffice it to say that especially in this field opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts."

The four dissenting justices seemed not to have such uncertainty about the necessity of settled legal principles.

"But as we held in the Wood Preserving Corp. Case, neither the Commerce Clause nor the Fourteenth Amendment prevent the imposition of the tax on receipts from an intrastate transaction even though the total activities from which the local transaction derives may have incidental interstate attributes.

. . .

"Indeed, if we are to remain concerned with the practical operation of these state taxes rather than with their descriptive labels (Nelson v. Sears, R. & Co., 312 U. S. 359, 363, 85 L. ed. 888, 891, 61 S. Ct. 586, 132 A. L. R. 475), we must acknowledge that the sales tax sustained in the Berwind-White Case 'was, in form, *imposed upon the gross receipts from an interstate sale.*' Lockhart, Gross Receipts Taxes on Interstate Transportation and Communication, 57 Harvard L. Rev. 40, 87. But that case did no more than to hold that those in interstate trade could not complain if interstate commerce carried its share of the burdens of local government which helped sustain it. And there was no showing that more than that was being exacted." (Our italics.)

In another case, the United States Supreme Court had this to say:

"Nor is taxation of a local business or occupation which is separate and distinct from the transportation of intercourse which is interstate commerce forbidden merely because in the ordinary course such transportation or intercourse is induced or occasioned by the business." *Western Live Stock* v. *Bureau of Revenue* (1938), 303 U. S. 250, 253, 82 L. Ed. 823, 58 S. Ct. 546, 115 A. L. R. 944.

The same court said previously:

"The mere extension of control over a business by the national government does not withdraw it from a local tax which presents no obstacle to the execution of national policy." *Federal Compress & W. Co.* v. *McLean* (1934), 291 U. S. 17, 23, 78 L. Ed. 622, 627, 54 S. Ct. 267.

Of course, a state may not, under the guise of a tax, place a real burden upon commerce among the several states. *New York, L. E. & W. R. Co.* v. *Pennsylvania* (1895), 158 U. S. 431, 39 L. Ed. 1043, 15 S. Ct. 896; 15 C. J. S., Commerce, §5, p. 259; 51 Am. Jur., Taxation, §203, p. 262.

At the same time it is not the purpose of the Commerce Clause to relieve those engaged in interstate commerce from their just share of the state tax burden.[3] *Western Live Stock* v. *Bureau of Revenue* (1938), *supra,* 303 U. S. 250, 82 L. Ed. 823, 58 S. Ct. 546, 115 A. L. R. 944.

It follows that the exemption of those engaged in interstate commerce from taxation borne by others should not be extended beyond the necessity of keeping the movement of such commerce free from interference or a "burden" as is sometimes said. To rule otherwise, expands the Commerce Clause by implied and fictitious assumptions to a point where it conflicts with another constitutional provision, and unnecessarily invades the state's sovereign and reserved powers.

The tax here involved is valid unless it is shown to interfere with congressional regulation of commerce among the states. That is ultimately the test, since fundamentally that is all the constitution takes from the State's sovereign powers and grants to the Congress of a Federal government, intended originally to be a government of *limited* powers. *Coverdale* v. *Arkansas-*

3. States may levy taxes on motor vehicles engaged in interstate commerce for the use of public highways where the privileged tax is no greater than that imposed upon other vehicles not engaged in interstate commerce. *Clark* v. *Poor* (1927), 274 U. S. 554, 71 L. Ed. 1199, 47 S. Ct. 702; *Interstate Transit* v. *Lindsey* (1931), 283 U. S. 183, 75 L. Ed. 953, 51 S. Ct. 380; See also Court, Commerce and Trade Payers (1940), 16 Ind. L. J. 144.

*Louisiana P. L. Co.* (1938), 303 U. S. 604, 82 L. Ed. 1043, 58 S. Ct. 736; *McGoldrick* v. *Berwind-White Coal Min. Co.* (1940), 309 U. S. 33, 84 L. Ed. 565, 60 S. Ct. 388, 128 A. L. R. 876; *J. D. Adams Mfg. Co.* v. *Storen* (1938), 304 U. S. 307, 82 L. Ed. 1365, 58 S. Ct. 913; *Swift & Co.* v. *United States* (1905), 196 U. S. 375, 49 L. Ed. 518, 25 S. Ct. 276.

The stipulation of the parties goes into considerable detail in outlining the transactions which result in the receipts which are claimed to be taxable. A description of each step of the performance and its sequence is set forth. Both parties charge the other with over-emphasizing certain details and minimizing others. To us, there appears nothing particularly unusual in these details or the sequence. The transactions must be looked upon as a whole. The details should not be permitted to obscure a perspective of the larger picture.

The transactions involved in this case relate exclusively to those articles ultimately to be moved out of the State after their manufacture at the two plants of the appellee at South Bend, Indiana. The performance on the part of Bendix was essentially that of manufacturing. During this process and at its termination, the Government and the prime contractors, as the case may be, made their inspections. Then came a time when "acceptance" of the manufactured article was made by the Government and the prime contractors. Without going into detail as to the provisions of the various contracts of the Army, Navy and Air Force, we quote from Section XIV of the Armed Services Procurement Regulation entitled "Inspection and Acceptance" which is applicable to the contracts involved:

"14-200. General.—Acceptance is the act of an authorized agent of the Government by which the Government acknowledges and agrees that the sup-

plies or services are in conformance with the contract requirements, including those of equality and quantity. Passage of title does not necessarily occur at the time of acceptance. Depending upon the provisions of the contract, acceptance may be effected prior to delivery, at the time of delivery, or after delivery. Generally, however, contracts shall provide that acceptance shall be accomplished as promptly as practicable after delivery. Except as may otherwise be provided in the contract, acceptance shall be conclusive except as regards to latent defects, fraud or such gross mistakes as amount to fraud. Except as otherwise provided in this section, supplies and services shall not be accepted prior to inspection. Inspection where made prior to acceptance, shall be merely for the convenience of the Government and without binding effect as to acceptance."

The above provisions seem to us to cover the situation adequately so far as we are here concerned.

Insofar as the matter of the passage of title of the manufactured articles affects the question here involved, it is agreed by the parties that in those cases where the Government made partial payments under a contract, title vested in the Government at that time, and all things connected with the specific contract, from the raw material through partially processed and completely processed and manufactured items. It was further stipulated in that connection that:

". . . it is agreed that Defendant [Indiana Department of State Revenue] may contend that the Plaintiff was furnishing special services rather than making a sale of goods."

Stipulation A-1.

With reference to the remaining manufactured articles for which no partial payment was made, the

contract of the parties provided for the delivery as follows:

"A-8. Delivery and Shipment. All of the items sold under the contracts involved in this action were shipped to the Government by common carrier, some being shipped by rail, some by truck, and all shipments being made f.o.b. carrier's equipment at the South Bend, St. Joseph County, Indiana, Plant of Plaintiff. All of the items sold by Plaintiff were placed on board the carrier's equipment by Plaintiff in accordance with the contract requirement. All shipments were made f.o.b. upon Government bills-of-lading. Each contract required delivery by Plaintiff on certain dates or within certain periods."

Those articles manufactured by appellee under subcontracts for prime contractors of the Government were to be delivered in the same manner, namely, to the Government's carrier at the appellee's plants in South Bend. The shipping destinations on the bills-of-lading in all instances were outside the geographical limits of the State of Indiana. This was true for all manufactured articles under contracts in which the Bendix was a prime contractor, as well as those in which it was the sub-contractor. The Government designated the destination, arranged for and provided the carrier. In all shipments the Government's bills-of-lading were used wherein the property shipped was identified as the property of the United States Government. The distinction to be pointed out between the commercial bill-of-lading and the Government bill-of-lading is that the former is a contract between the shipper or consignor and the carrier, while the latter, by its language, is a contract between the Government and the carrier. The form of this instrument was prepared by the Government and one of the reasons

therefor, was for the purpose of securing the advantages of certain rates for shipments over land-grant railroads. The contracts in this case provided for preferences to such railroads in the shipment of goods here involved. In considering the legal effect of a Government bill-of-lading, the United States Supreme Court has said:

"... the title passed to the United States by delivery at the initial point of shipment to the carrier as agent. Land-grant rates were applicable." *Illinois Central R. Co.* v. *United States* (1924), 265 U. S. 209, 68 L. Ed. 983, 44 S. Ct. 485.

The parties seem to be in substantial agreement that at the time the manufactured articles were loaded on the carriers at the Bendix plants in Indiana, title and possession passed from appellee to the Government, and all control over its movement passed from Bendix. Uniform Sales Act, Acts 1929, ch. 192, §19, p. 628, being §58-203, Burns' 1951 Replacement.

Bendix contends that in accordance with the terms of the contract, it manufactured, packaged, and placed the goods on a common carrier "in the stream of commerce" bound for out-of-state destination, and that such commerce is exempt from state taxation. The appellant, on the other hand, says that the tax here is laid upon an entirely local Indiana activity consisting mainly of the manufacture of the articles for which the receipts involved here were obtained, and that although Bendix had the obligation to make delivery at the factory on a carrier, its title, possession, and control over the articles ended at that point in appellee's plant in Indiana. Before a tax is invalid appellant says "there must be some activity of the seller which extends beyond the borders of the state of Indiana." The appellee had no

duty to make delivery at any point outside the state of Indiana—in fact, outside its plant.

There is no question about the government bill-of-lading fixing the title in the Government. When the articles manufactured were placed f.o.b. carrier at the plant the Government had control and possession, and could have re-routed or stopped the transportation at any point thereafter.

The authorities cited by the parties center mainly about the interpretation to be given the cases of *Gross Income Tax Div.* v. *Conkey Co.* (1950), 228 Ind. 352, 90 N. E. 2d 805, Cert. Denied (1951), 340 U. S. 941, 95 L. Ed. 679, 71 S. Ct. 502 and *Dept. of Treas. of Indiana* v. *Wood Preserving Corp.* (1941), 313 U. S. 62, 85 L. Ed. 1188, 61 S. Ct. 885.

In the Conkey case a printer and manufacturer of books under contract with the publisher, sent the books after manufacture across state lines to purchasers as directed by the publisher, who was selling the books to his customers. The court said in the Conkey case, *supra,* at page 357, with reference to the Indiana tax applicable to the receipts therefrom by the printer:

> "It would seem to us that as to the printing and binding of books, as here, the appellee was rendering a local service and the gross receipts therefrom are not from interstate commerce. What appellee was being paid for was the service rendered and its materials used in an activity purely local in nature. *Dept. of Treasury of Indiana* v. *Ingram-Richardson Mfg. Co.* (1941), 313 U. S. 252, 85 L. Ed. 1313, 61 S. Ct. 866; *Western Live Stock* v. *Bureau* (1938), 303 U. S. 250, 82 L. Ed. 823, 58 S. Ct. 546.
>
> . . .
>
> "The delivery of the books by appellee to the carrier in the manner as above pointed out was but an incident to and in aid to its local printing and

binding business as was the case in *Dept of Treasury* v. *Ingram-Richardson, supra.*"

In addition, the manufacturer in the above case also bought bookcases to be used with the set of books printed, and resold the cases with the books and shipped the cases across state lines to customers as directed by the purchaser. The court in that case held those transactions were not entirely local, but were in interstate commerce. No manufacturing was involved in the latter transaction, and it seems the printer or seller assumed the obligation to make deliveries, or put the buyer in possession at a point outside the State of Indiana. *Gross Income Tax Division* v. *L. S. Ayres & Co.* (1954), 233 Ind. 194, 118 N. E. 2d 480.

In the Wood Preserving Case, *supra,* the company sold ties to a railroad. The railroad ties were inspected by an agent of the railroad as they were brought to its siding in Indiana from points in Indiana, and those accepted were immediately placed on cars belonging to the railroad. A bill-of-lading was then executed by the Wood Preserving Corporation designating itself as consignor. An agent of the railroad at Finney, Ohio, was named consignee. The purchasing railroad was designated as the carrier. The United States Supreme Court held that the receipts from the sale of the ties were properly taxable by the State of Indiana.

The appellee, Bendix, in its brief, makes the following comment on this case:

"The Plaintiff in the instant case and the Defendant here are not in dispute over transactions of the kind which occurred in the Wood Preserving case. If, for example, items are manufactured and sold to the United States Government to be transported to a point outside the State by the Government's own conveyances and the Government then sends its own transportation equipment to South

Bend to pick up the items, as for example, by military plane at our County airport, everyone would admit that the State of Indiana is entitled to collect gross income tax on the gross receipts from such sale. The example corresponds to the facts of the Wood Preserving case."

The line which appellee draws between taxable and non-taxable receipts appears to us to be unjustified. There is no difference in the effect on interstate commerce whether the purchaser in such a case carries the article away and across the state line *in his own vehicle,* or *has an agent* on hand at the time of delivery to take possession and carry it across the state line for him. In either instance, the result is the same. In the case before us, the carriers who came to the plant of the Bendix Corporation in Indiana and took delivery of the manufactured articles were agents of the purchasers, and to all practical effects, it is the same as if the purchaser in person had taken the articles at the plant.

We believe many of the points of dispute in this case are answered by the case of *International H. Co.* v. *Dept. of Treasury, supra* (1944), 322 U. S. 340, 88 L. Ed. 1313, 64 S. Ct. 1019, 1030; *Dept. of Treasury* v. *International Harvester Co.* (1943), 221 Ind. 416, 47 N. E. 2d 150.

This is particularly true in connection with appellee's reliance upon a statement in the Conkey Case that "the transporting of the property out of the State was not within the contemplation of or part of the local sales contract."

The Supreme Court of the United States in the International Harvester Case, *supra,* gave consideration to various types of transactions covered by the Indiana

tax, and made the following statement at page 345 of 322 U. S., p. 1317 of 88 L. Ed.:

"The Class D sales are sales by an Indiana seller of Indiana goods to an out-of-state buyer who comes to Indiana, takes delivery there and transports the goods to another state. The Wood Preserving Corp. Case indicates that it is immaterial to the present issue that the goods are to be transported out of Indiana immediately on delivery. Moreover, both the agreement to sell and the delivery took place in Indiana. Those events would be adequate to sustain a sales tax by Indiana."

The *mere knowledge* on the part of the seller in Indiana of the intended out-of-state destination of goods sold and delivered in Indiana to a buyer does not convert an intrastate transaction to an interstate transaction, and thereby create a burden interfering with congressional regulation of such commerce.

Appellee, Bendix, in its brief, makes the further contention:

"The Appellee's obligations to the United States Government are a continuing thing with delivery upon the selected carrier the constitutional equivalent of the delivery of the goods to the point of destination."

The weight of authority seems to be against the appellee on this point.

"It is generally held that a movement merely in preparation for export—in other words, a mere transfer of the property to a depot or other place within a state from which the transportation or journey to another state is to begin at a convenient time—is not a part of that transportation, so as to exempt the property because of such transfer or movement from state taxation upon the ground of interference with or burden upon interstate commerce." 51 Am. Jur., Taxation, §205, p. 266.

The Supreme Court of the United States has also said in the International Harvester Case, *supra,* at page 345 of 322 U. S., p. 1317 of 88 L. Ed.:

"In *McGoldrick* v. *Berwind-White Coal Min. Co.* 309 U. S. 33, 84 L. Ed. 565, 60 S. Ct. 388, 128 A. L. R. 876, we had before us a question of the constitutionality of a New York City sales tax as applied to purchases from out-of-state sellers. The tax was 'laid upon the buyer, for consumption, of tangible personal property, and measured by the sales price.' *Id.* 309 U. S. p. 43, 84 L. Ed. 568, 60 S. Ct. 388, 128 A. L. R. 876. And it was 'conditioned upon events occurring' within New York, i.e., the 'transfer of title or possession of the purchased property.' *Id.* pp. 43, 44. Under the principle of that case, a buyer who accepted delivery in New York would not be exempt from the sales tax because he came from without the State and intended to return to his home with the goods. The present tax, to be sure, is on the seller. But in each a local transaction is made the taxable event and that event is separate and distinct from the transportation or intercourse which is interstate commerce. In neither does the tax aim at or discriminate against interstate commerce. The operation of the tax and its effect on interstate commerce seem no more severe in the one case than in the other."

Looking at these facts as a whole before us, the receipts resulted from transactions completely performed in Indiana. The performance was essentially local in character. The tax does not discriminate against interstate commerce nor does it interfere with the grant of power to Congress to regulate commerce among the several states. *Indiana Farmers Guide Pub. Co.* v. *Dept. of Treas.* (1940), 217 Ind. 627, 29 N. E. 2d 781; 11 Am. Jur., Commerce, §34, p. 34.

Since the facts herein have been stipulated a new trial will serve no purpose. The judgment is reversed with direction to enter judgment for the appellant.

Achor, Bobbitt and Landis, JJ., concur.

Emmert, J., not participating.

NOTE.—Reported in 143 N. E. 2d 91.