The BOEING COMPANY, a Delaware Corporation; and the United States of America, Plaintiffs and Respondents,

v.

Lloyd OMDAHL, as Tax Commissioner of the State of North Dakota, and his Successors in Office; Gaffaney's Minot Stationery Company, a Corporation; Souris River Telephone Mutual Aid Cooperative, a Corporation; and Porter Bros. Steel and Iron, a Partnership Composed of Harold Porter and Zalmon Porter, Partners; Defendants.

Lloyd OMDAHL, as Tax Commissioner of the State of North Dakota, Cross-Claimant and Appellant,

v.

GAFFANEY'S MINOT STATIONERY COMPANY, Souris River Telephone Mutual Aid Cooperative, and Porter Bros. Steel and Iron, Cross-Defendants and Respondents.

Civ. No. 8516.

Supreme Court of North Dakota.

June 26, 1969.

Holman, Marion, Black, Perkins & Coie, Seattle, Wash., and Degnan, McElroy & Lamb, Grand Forks, for The Boeing Co.

Mitchell Rogovin, Asst. Atty. Gen., and Lee A. Jackson, William A. Friedlander, and Stuart A. Smith, Dept. of Justice, Washington, D. C. and John O. Garaas, U. S. Dist. Atty., Fargo, for the United States.

Helgi Johanneson, Atty. Gen. of North Dakota, and Kenneth M. Jakes, Sp. Asst. Atty. Gen., Bismarck, for Tax Commissioner of North Dakota.

Pringle, Herigstad, Meschke, Loder, Mahoney & Purdy, Minot, for Gaffaney's Minot Stationery Co., Souris River Tel. Mut. Aid Co-op., and Porter Bros. Steel & Iron.

PAULSON, Judge.

This is an appeal from an amended declaratory judgment entered in the District Court of Burleigh County, North Dakota, on October 10, 1966, Clifford Jansonius,

J., presiding. The Boeing Company entered into contracts with the United States Government and, pursuant to said contracts, was engaged in installing, calibrating, and checking out various components of the missile launch sites, control centers, support buildings, and other facilities constituting the Minuteman missile bases at the Minot and Grand Forks Air Force bases. The contracts are designated as follows:

Letter Contract No. AF 04(647)–936
Definitive Contract No. AF 04(647)–936
Letter Contract No. AF 04(694)–362
Definitive Contract No. AF 04(694)–362
Facilities Contract No. AF 04(647)–683

Certain items of tangible personal property and services were utilized in North Dakota, pursuant to the above-listed contracts. In addition, there were other items of tangible personal property purchased outside North Dakota but utilized inside North Dakota, and, as a result of this purchasing procedure, the State claimed sales and use taxes on certain of the materials that were purchased both inside and outside North Dakota to complete these contracts.

The Boeing Company and the United States took issue with the State's claim that sales and use taxes were owed on the abovementioned transactions. Boeing and the United States sought a declaratory judgment in the district court determining that they were not liable for the sales and use taxes by virtue of the contractual relationship existing between The Boeing Company and the United States.

The State Tax Commissioner was named as a defendant, and also designated as defendants were Gaffaney's Minot Stationery Company, Souris River Telephone Mutual Aid Cooperative, and Porter Bros. Steel and Iron, three of the retailers from whom goods and services were purchased. Prior to the commencement of the trial in the district court, certain stipulations of fact were executed by all parties concerned.

Some of the pertinent parts of the stipulations are as follows:

The State claims sales and use taxes are owing on the following:

1. Property and services procured by Boeing in North Dakota, pursuant to Letter or Definitized Contracts No. AF 04(647)–936 or No. AF 04(694)–362;

2. All property which was procured by Boeing outside North Dakota, pursuant to the contracts alluded to in paragraph 1; and

3. All property which was purchased at retail by Boeing under Facilities Contract No. AF 04(647)–683, and as first used in North Dakota by Boeing.

It was further stipulated that Boeing was not liable for North Dakota sales and use taxes with respect to the following:

1. Property procured and produced by Boeing under Letter or Definitive Contracts No. AF 04(694)–107 or No. AF 04(694)–431, or under Negotiated Contract No. AF 04(694)–46;

2. Property acquired from the General Services Administration or under Federal Supply Schedules;

3. Property furnished to Boeing by the Government from its industrial reserves; and

4. Government-owned property used by the Government, Boeing, or others outside North Dakota prior to its utilization in North Dakota.

The district court awarded judgment to Boeing and the United States by determining that, under the laws of North Dakota, The Boeing Company was not liable for any sales or use taxes because it had in effect purchased the goods and services as an agent of the Federal Government, and thus these purchases were nontaxable.

The appeal was taken from the judgment of the lower court, and the State sets forth the following specifications of error:

"1. The District Court erred in ordering judgment against the Defendants declaring that:

'No sales or use taxes are payable with respect to any purchase, procurement, use, storage, or consumption of tangible personal property or services by the Plaintiff, Boeing, heretofore or hereafter in the performance of said contracts for which it is entitled to reimbursement from the Plaintiff, Government, or which is owned by and furnished to it by the Plaintiff, Government.'

"2. The District Court erred in ordering judgment against the Defendants declaring:

'That Plaintiff, Boeing, is not and will not be liable to Defendants, Gaffaney's Minot Stationery Company, a corporation, Souris River Telephone Mutual Aid Cooperative, a corporation, and Porter Bros. Steel and Iron, a partnership composed of Harold Porter and Zalmon Porter, partners, with respect to any procurement or purchase of tangible personal property or services in North Dakota by Boeing in the performance of said contracts for which it is entitled to reimbursement from the Government.'"

The basic contentions of the parties to this lawsuit are:

The State contends that Boeing is liable for the North Dakota sales and use taxes on property and services procured inside or outside North Dakota in connection with the contracts involved, to which the United States allegedly is the principal party. More specifically, the contention of the State is that the sales tax (Ch. 57–39, North Dakota Century Code) applies to nearly all purchases made inside North Dakota, and that the use tax (Ch. 57–40, N.D.C.C.) applies to some purchases made inside North Dakota and to all purchases made outside North Dakota, of goods which were deliver-

ed to and used at the base sites inside North Dakota. The State further contends that after the reeactment of the North Dakota Sales Tax Act failed on referendum and thereby expired as to all sales made after July 1, 1965, the use of property purchased in North Dakota was then subject to tax under the provisions of the North Dakota Use Tax Act.

Boeing contends, however, that neither the Sales Tax Act nor the Use Tax Act is applicable to the procurement or use of the property pursuant to the contracts involved. Boeing's reasoning is that the procurement or use was on behalf of the United States; that Boeing was at all times acting as agent for the United States; and that title to all property purchased for completion of the contracts passed directly from the vendors to the United States. Thus it contends that the United States was in fact the purchaser. Boeing further contends that if the United States was the purchaser, the purchases then would be exempt from the sales tax under North Dakota law and would be immune from taxation under the Federal Constitution. Boeing further urges that the attempt by the State to extend the purview of the use tax to include in-State purchases made during the period from July 1, 1965, to April 1, 1967, is contrary to the purposes of the Use Tax Act and is without merit because the use tax was never intended to apply to in-State purchases.

The instant case is another in a long line of cases which involve the basic issue that the United States cannot be taxed directly by the several States. The concept that the United States is immune from such taxation by the States and by lesser subdivisions originally was promulgated in McCulloch v. Maryland, 4 Wheat. 316, 436, 4 L.Ed. 579 (1819). This principle of immunity also has been extended to include instrumentalities of the United States. See, e. g., United States v. Allegheny County, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944). Although the principle that the United States is immune from state taxation is simple, such principle of immunity

generally is difficult to apply because of the divergent circumstances and facts which accompany the myriad of United States Government activities. Since the first promulgations of the immunity doctrine, the United States Government has become increasingly involved in the private business sector, and Government contracts now encompass much wider and more complex areas than they have in the past; and, as a result, decisions of the courts pertaining to whether taxes are in fact levied on the United States or on a private concern will be determined by the particular facts and circumstances in each case.

It is, however, enlightening to note some of the promulgations of the United States Supreme Court in cases analogous to the instant case. The trend of the decisions has been from a very strict interpretation of the immunity principle to a more liberal interpretation.

Some of the earlier United States Supreme Court decisions have held that when the economic burden of a tax fell upon the Federal Government, then the tax was invalid. That concept was changed in James v. Dravo Contracting Co., 302 U.S. 134, 160, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318 (1937), wherein the court held that the mere fact that the Federal Government's total cost or economic burden was increased because of the tax provisions of a state would not necessarily invalidate the tax. See also Alabama v. King & Boozer, 314 U.S. 1, 5, 62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615 (1941); United States v. City of Detroit, 355 U.S. 466, 469, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958), for cases following the reasoning in the *James* case. In regard to the taxability of persons contracting with the United States, the United States Supreme Court, in Penn. Dairies, Inc. v. Milk Control Commission of Pennsylvania, 318 U.S. 261, 269, 63 S.Ct. 617, 620–621, 87 L. Ed. 748 (1943), said:

" * * * those who contract to furnish supplies or render services to the government are not such [Federal] agencies

and do not perform governmental functions, [citations omitted], and the mere fact that non-discriminatory taxation or regulation of the contractor imposes an increased economic burden on the government is no longer regarded as bringing the contractor within any implied immunity of the government from state taxation or regulation. [Citations omitted.]"

The United States Supreme Court, in Esso Standard Oil Co. v. Evans, 345 U.S. 495, 73 S.Ct. 800, 97 L.Ed. 1174 (1953), stated:

"The Constitution does not extend sovereign exemption from state taxation to corporations or individuals, contracting with the United States, merely because their activities are useful to the Government or because the tax would burden the Government financially."

■ The present test of validity or invalidity of a tax on purchases made pursuant to these contracts executed between the United States Government and private contractors is referred to as the "legal incidence" test. The determinative factor under this test is: Who is going to be legally obligated to pay for the goods upon which the tax is imposed? Where the contractor is the one legally obligated to pay for the goods, then the tax is valid; the tax is invalid if the United States is legally obligated to pay for the goods. Alabama v. King & Boozer, *supra*.

It is necessary for the courts to scrutinize very carefully the contractual provisions in these cases before making a determination as to taxability, because, as the United States Supreme Court, in Metcalf & Eddy v. Mitchell, 269 U.S. 514, 522–523, 46 S.Ct. 172, 174, 70 L.Ed. 384 (1926), stated:

" * * * it is apparent that not every person who uses his property or derives a profit, in his dealings with the government, may clothe himself with immunity from taxation on the theory that either

he or his property is an instrumentality of government within the meaning of the rule. [Citations omitted.]

"As cases arise, lying between the two extremes, it becomes necessary to draw the line which separates those activities having some relation to government, which are nevertheless subject to taxation, from those which are immune. Experience has shown that there is no ·formula by which that line may be plotted with precision in advance. But recourse may be had to the reason upon which the rule rests, and which must be the guiding principle to control its operation."

Thus, this court will analyze closely the contractual provisions and the rights and duties of the various parties involved in the instant case.

It is necessary to define the different types of Government contracts in this case, since there are many references in them to letter contracts, definitized contracts, and facilities contracts, which employ technical terminology.

■ A letter contract is a written contractual instrument with sufficient provisions to permit the contractor to begin performance of services, including planning and procurement of necessary materials. (Department of the Army Procurement Law, May 1961, p. 182.)

A definitized contract is one which supersedes a letter contract at the earliest practicable time and encompasses the terms of the letter contract and is the final composite contractual agreement. (Department of the Army Procurement Law, May 1961, p. 184.)

A facilities contract is one in which:

" * * * facilities are provided by the Government for use in connection with the performance of a separate contract or contracts for supplies or services." Avco Manufacturing Corporation v. Con-

nelly, 145 Conn. 161, 140 A.2d 479, 481 (1958).

The above-defined contracts contain many varied methods of profit determination and cost procedures. The specific ones involved in the instant case are as follows:

Letter Contract No. AF 04(647)–936 is a cost-plus-a-fixed-fee contract which:

" * * * is a cost contract which provides a profit, called a 'fee', to the contractor in addition to the reimbursement of his allowable costs." (Department of the Army Procurement Law, May 1961, p. 170.)

The fee is based on the estimated cost of performance of the contract and does not vary with the actual cost of performance.

Definitized Contract No. AF 04(647)–936 is a fixed-price incentive contract with provisions for value engineering incentives, although initially it was intended to be a cost-reimbursement-type contract. A fixed-price incentive contract is a fixed-price contract providing for a variable profit to the contractor, which profit is determined by a formula provided in the contract which rewards the contractor with additional profit when he operates efficiently and penalizes him by reducing his profit when he operates inefficiently.

Letter Contract No. AF 04(694)–362 is a fixed-price-incentive-fee-type contract, and Definitized Contract AF 04(694)–362 is a fixed-price incentive contract with a provision for value engineering incentives. Facilities Contract AF 04(647)–683 is a cost-reimbursement-type contract. A cost-reimbursement contract provides for payment to the contractor of all, or sometimes a portion, of his allowable costs, which costs at all times must be reasonable. There are several types of cost-reimbursement contracts and it appears that Facilities Contract AF 04(647)–683 is of the type that provides for reimbursement to the contractor for all allowable costs, but for no profit.

Thus all of the contracts provided that Boeing would derive a profit from its activities except Facilities Contract AF 04(647)–683, which was executed in conjunction with the profit-making contracts.

The court will consider some of the salient parts of the contracts in determining whether Boeing was the purchaser, under the provisions of Chapters 57–39 and 57–40, N.D.C.C. The target profit for The Boeing Company on Definitized Contract AF 04(647)–936 was $3,910,000, with an additional profit incentive of 15 per cent of the amount by which the total, final negotiated cost was less than the total target cost. Boeing's target profit on Definitized Contract AF 04(694)–362 was $3,025,750. Thus Boeing had as a target profit from these contracts a total sum of not less than $6,935,750, which amount could be increased considerably if Boeing reduced the total cost of the project. The record indicates that Boeing entered into the contracts for a substantial profit, which profit ultimately would be determined by Boeing, based on its quality of performance, and not as a result of any action by the United States Government.

■ Another determinative facet of the contracts is: Who has title to the goods which were purchased in order to complete these contracts? If the Government is found to have complete, uninhibited title and almost exclusive control of the actions of the contractor, then the State of North Dakota could not tax the Government purchases [§ 57–39–03, 1965 Supp. (now found at § 57–39.2–04, 1967 Supp.) N.D.C.C.]. McCulloch v. Maryland, *supra*. The parties to this action have stipulated that title to property purchased by Boeing outside North Dakota passed to the United States outside North Dakota. The State, however, contends that the parties have not stipulated as to the time when title to property purchased in North Dakota from North Dakota vendors vested in the United States, nor have the parties stipulated as to the time when title passed to

the United States in regard to various services which were purchased by Boeing.

The State also contends that even if title passes immediately to the United States in the case of goods purchased outside North Dakota, as the parties have stipulated, it does not necessarily follow that the contractor is an agent of the Government for purchase. The courts have recognized that there are other reasons which make automatic-title passage attractive to the United States when it enters into these various contracts. One reason recognized by the courts is that the rights of the Government will be protected in the event the contractor becomes bankrupt, since, with title in the Government, the property would not be subjected to any creditors' claims. In re American Boiler Works, 220 F.2d 319 (3d Cir. 1955), aff'g 123 F.Supp. 352. Another reason for providing that title shall vest immediately in the Government is that goods can be shipped on Government bills of lading; thus favorable rates and faster service will be received on land-grant railroads. Ind. Dept. of State Rev. v. Bendix Aviation Corp., 237 Ind. 98, 143 N.E.2d 91, 96 (1957).

With regard to passage of title to goods purchased in North Dakota, the State contends that the provisions of the contracts calling for inspection prevent absolute and final passage of title until inspection and approval take place. It has been held, however, that title passes directly to the United States even though there is an inspection provision in a contract and the Government could still return the goods if dissatisfied. Avco Manufacturing Corporation v. Connelly, 145 Conn. 161, 140 A.2d 479 (1958). The decision in *Avco,* however, is limited to the facts in that particular case, and the Connecticut court points out, as do many other courts, that an important consideration is the intent of the parties, and such intent: .

"* * * is ascertained 'from the language used, interpreted in the light of the situation of the parties and the cir-

cumstances surrounding them.' United Aircraft Corporation v. O'Connor, 141 Conn. 530, 538, 107 A.2d 398, 402." Avco Manufacturing Corporation v. Connelly, *supra,* 140 A.2d at 483.

The intent of the parties must be ascertained in the instant case from the terms and provisions of the various contracts involved.

Other important contractual provisions are those providing for progress payments, which the State contends also negate immediate passage of title, as, otherwise, the contracts would provide that the Government make payments for the individual purchases rather than make progress payments on the entire contract. Boeing states that similar arguments have been made in other cases, and the courts almost unanimously have held that these contracts effect full and complete passage of title, at least to the extent of the partial payments. *E. g.,* Boeing Company v. United States, 338 F.2d 342, 352, 168 Ct.Cl. 109 (1964), cert. denied 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed. 2d 269. It should be noted, however, that the United States Supreme Court has said that not every contract calling for progress payments will be deemed to effect concurrent title transfer, since the basic consideration must be the intent of the parties and this is determined from the circumstances attending the transaction. Clarkson v. Stevens, 106 U.S. 505, 515, 1 S.Ct. 200, 27 L.Ed. 139 (1882).

Another point of contention urged by the State is that there are numerous clauses in the contracts providing that the Government will be liable for state sales and use taxes that Boeing may become liable for pursuant to these contracts. The State claims that this clearly indicates that the Government and Boeing did not intend to establish a principal-agency relationship which would thus make the tax a direct tax on the Government. Boeing contends that the above-mentioned clauses in the contracts mean nothing except that Boeing insisted on protection against unknown con-

tingencies. Boeing's argument in this regard is rather nebulous, since some of the contracts have made specific reference to the North Dakota sales and use taxes, which reference would have been superfluous if it were intended that Boeing was simply an agent.

■■■ The final point of contention on this aspect of the case is: Who is obligated to pay for the goods? The contention arises because, if the legal obligation for payment falls upon the Government, then, under the more recent United States Supreme Court promulgations, the Government shall be deemed the purchaser and any tax directly on the purchases would be void. This result would arise, because the North Dakota Supreme Court has held that the North Dakota sales tax is a tax on the purchaser [Jewel Tea Co. v. State Tax Commissioner, 70 N.D. 229, 293 N.W. 386, 387 (1940)], and if the United States is found to be the purchaser, then the purchases would be exempted from the provisions of the sales tax. § 57–39–03(6), 1965 Supp. (now found at § 57–39.2–04(6), 1967 Supp.) N.D.C.C.

Thus the pertinent issue at this point is whether the Government would have been obligated to pay for the goods necessary to perform or to complete the contracts if Boeing had refused to do so. As the United States Supreme Court stated, in Alabama v. King & Boozer, *supra,* 314 U.S. at 10, 62 S.Ct. at 46:

"* * * But it seems plain, as the Government concedes and as we assume for present purposes, that under the provisions of the statute the purchaser of tangible goods who is subjected to the tax measured by the sales price, is the person who orders and pays for them when the sale is for cash or who is legally obligated to pay for them if the sale is on credit."

The State contends that under the contracts and the facts in the instant case it is clear that the vendors could enforce

payment only against Boeing. Boeing, however, contends that because the contract provides for prompt passage of title, the United States became the purchaser. This court, in Jewel Tea Co. v. State Tax Commissioner, *supra,* held that the tax was on the purchaser, and if the United States was deemed the purchaser it would be liable for the tax and, thus, the tax would be void because of the constitutional and statutory provisions of immunity. In Alabama v. King & Boozer, *supra,* 314 U.S. at 13, 62 S.Ct. at 47, the Government argued that title vested in it, thus making it the purchaser; however, the United States Supreme Court answered this argument by stating:

"But however extensively the Government may have reserved the right to restrict or control the action of the contractor in other respects, neither the reservation nor the exercise of that power gave to the contractors the status of agents of the Government to enter into contracts or to pledge its credit. See United States v. Algoma Lumber Co., 305 U.S. 415, 421, 59 S.Ct. 267, 270, 83 L.Ed. 260; United States v. Driscoll, 96 U.S. 421, 24 L.Ed. 847."

Boeing now argues in its brief that the Government, on the facts in this case, would be liable to the vendor of the goods purchased as a disclosed principal. However, in order that there be a principal, an agency relationship must exist, and a thorough analysis of the record in the instant case reveals that Boeing was not an agent for the Government. In addition, in the court below, the Government attorney informed the court that he could not say that the Government would be liable for the goods if Boeing failed to pay. As the United States Supreme Court said, in United States v. Township of Muskegon, 355 U.S. 484, 486, 78 S.Ct. 483, 485, 2 L.Ed. 2d 436 (1958):

"Constitutional immunity from state taxation does not rest on such insubstantial formalities as whether the party us-

ing the government property is formally designated a 'lessee.' Otherwise immunity could be conferred by a simple stroke of the draftsman's pen. The vital thing under the Michigan statute, and we think permissibly so, is that Continental was using the property in connection with its own commercial activities. The case might well be different if the Government had reserved such control over the activities and financial gain of Continental that it could properly be called a 'servant' of the United States in agency terms. But here Continental was not so assimilated by the Government as to become one of its constituent parts. It was free within broad limits to use the property as it thought advantageous and convenient in performing its contracts and maximizing its profits from them."

The above-quoted material is applicable to the instant case, since even though the Government maintained a certain amount of control, Boeing still was performing the contracts with a good deal of discretion and Boeing stood to gain a greater or lesser profit based on its own performance. In addition, Boeing did not have the power to pledge the Government's credit. It is also interesting to note that the case of Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954), a case on which Boeing strongly relies, was a 6-to-3 decision, and the six Justices no longer are on the United States Supreme Court who signed the majority opinion, wherein the dissenting Justices, Warren, Black, and Douglas, stated:

"The concepts 'title,' 'agency,' and 'obligation to pay' are no basis for this constitutional adjudication. Today they are used to permit any government functionary to draw the constitutional line by changing a few words in a contract. When the Congress deliberates over this problem, as it often has, it does not worry about the passing of title or other legal techicalities. The Congress debates whether as a matter of policy, including the need of the States for revenue, the holder of the cost-plus government contract should be immune from state taxation." 347 U.S., at 126–127, 74 S.Ct. at 413.

In the instant case we have a government functionary attempting to secure a constitutional adjudication, based, not upon written words in a contract, but upon a theory advanced in oral argument in this court, namely, that the Government is a disclosed principal and therefore is liable for payment for the goods in the event that Boeing should not pay, thus attaching the legal incidence on the Government.

Under the terms of the contracts in the instant case, Boeing had a considerable amount of discretion in performing the contracts, under which it would receive a substantial profit. As indicated in Thiokol Chemical Corporation v. Peterson, 15 Utah 2d 355, 393 P.2d 391 (1964), another case arising from Minuteman missile construction, profit and the fact that the contractor had much leeway in accomplishing the end result are valid considerations when a court is attempting to determine whether the contractor is acting as an agent of the Government or as an independent contractor. The court stated, in *Thiokol:*

"While we do not desire to disparage Thiokol's motives in rendering this important Government service, the fact that it used the property in a business for profit is not to be gainsaid. For the tax year involved, 1961, the profit to Thiokol was in excess of four million dollars. In addition to this substantial profit, Thiokol also benefits in carrying on this project by having the opportunity of maintaining a position of industrial leadership in the competitive field of producing and manufacturing missiles and their components and propellants." 393 P.2d at 395.

This statement applies with equal force to Boeing in the instant case.

The California Supreme Court, in General Dynamics Corp. v. County of Los

Angeles, 51 Cal.2d 59, 330 P.2d 794, 798 (1958), stated:

"The right to obtain an economic benefit from the use or possession of property may be a relevant consideration in determining who is actually its owner for tax purposes in doubtful cases [citations omitted], but the existence of such right is not controlling."

In considering the question of whether a contractor is acting as an agent or as an independent contractor, the court stated, in Thiokol v. Peterson, *supra,* 393 P.2d at 394:

"The line of demarcation between one who operates as an independent contractor as opposed to one who is the servant or agent of another is sometimes a bit blurred. This court has on a number of occasions confronted this problem and set forth various criteria to be considered in making the proper classification. The most fundamental one relates to the extent of control by the one who hires over the one who performs the service. If the employer's will is represented only by a desired result, the indication is of an independent contractor; whereas, if the employer exercises control over the means of accomplishing the result, this points toward an agent or servant relationship."

The record in this case indicates that many of the purchases were made in the name of the contractor; that the legal incidence was on Boeing, as Boeing's credit, and not that of the United States, was guaranteeing payment; that there was Government control over certain contractual aspects, but, as indicated above, the contractor had considerable discretion in arriving at the end result. Even though title vests immediately in the United States, that is not conclusive of ownership for tax purposes when it appears that the taxpayer retains the essential indicia of ownership. General Dynamics Corp. v. County of Los Angeles, *supra.*

The United States Supreme Court stated, in Alabama v. King & Boozer, *supra,* 314 U.S. at 9–10, 62 S.Ct. at 46:

"Who, in any particular transaction like the present, is a 'purchaser' within the meaning of the statute, is a question of state law on which only the Supreme Court of Alabama can speak with final authority."

Thus we hold that Boeing was the prime purchaser and user of these goods for the purpose of deriving a profit and, accordingly, Boeing will be considered the purchaser, and liable for the sales tax.

Boeing's alternative contention is that the sale to Boeing was a sale for a resale within the meaning of § 57–39–01 (3), N.D.C.C., and thus the sale to the Government would be the retail sale and the sale to Boeing would be a sale for a resale and exempt under § 57–39–01(3). The record in this case further indicates that Boeing was purchasing the goods and services for the furtherance of its contracts; that during the course of performance of the contracts it installed equipment and components, and thus the personalty was incorporated into the realty and would not constitute a resale exempting Boeing from the taxing statute. Northern Improvement Company v. Engen, 68 N.W. 2d 463 (N.D.1954). Boeing contends that *Engen* does not apply because in *Engen* the property ceased being personalty and was incorporated into the realty before title passed, whereas in the instant case title vested in the United States immediately. This contention is without merit because, as pointed out previously, contract provisions for immediate passage of title are used for numerous reasons, but the courts look to substance rather than to form. Thus Boeing's alternative contention is also without merit.

The next issue is whether Boeing is liable for use taxes on goods purchased outside the State of North Dakota, which goods were used inside North Dakota on

the various missile site projects. Section 57–40–02, 1963 Supp. (now found at § 57–40.2–02, 1967 Supp.), N.D.C.C., provided that the use tax:

"* * * is imposed on the storage, use, or consumption in this state of tangible personal property purchased at retail for storage, use, or consumption in this state, at the rate of two *and one-quarter* per cent of the purchase price of such property. Except as limited by section 57–40–10, an excise tax is imposed on the storage, use, or consumption in this state of tangible personal property not originally purchased for storage, use, or consumption in this state at the rate of two *and one-quarter* per cent of the fair market value of such property at the time it was brought into this state." [Emphasis added.]

The emphasized portion became effective July 1, 1963.

It was also necessary for Boeing to purchase outside North Dakota certain goods and materials which were used inside North Dakota; thus the State asserts that the use tax statutes apply and that Boeing is also liable for the use tax. The State employs the same argument in regard to Boeing's liability for the use tax as it does in regard to its liability for the sales tax, namely, that Boeing was the final user or consumer of supplies of all kinds purchased under the contracts, whether the goods were purchased inside or outside North Dakota, regardless of when or where title passed to the Government.

Boeing initially uses the same argument with regard to the use tax as it uses with regard to the sales tax, namely, that it is a direct tax on the Government, thus contravening the governmental immunity principle set forth in the Federal and State Constitutions, as well as the exemptions set forth in the statutes.

With reference to the application of the use tax, Boeing contends that the sales tax applied only to sales and leases of tangible personal property occurring within North Dakota, and that the North Dakota use tax was enacted for the purpose of applying the same rate of tax on similar transactions which otherwise would escape taxation solely by reason of the fact that the sales occurred out of the State. Boeing urges that since it was neither a purchaser nor a lessee of the property, the use tax could not apply to it. Boeing's reasoning is that the United States Government is the purchaser and cannot be taxed because of its immunity from state taxation. In other words, Boeing contends that it could be liable for the use tax only with respect to property which it owned or possessed by reason of purchase, lease, or rental. The State contends that North Dakota's use tax provisions are not so restricted as Boeing asserts.

It is thus necessary to examine the provisions of the use tax law to ascertain the intent of the Legislature.

In § 57–4001 of the North Dakota Revised Code of 1943 several definitions are set forth, including the following:

"2. 'Use' shall mean the exercise by any person of any right or power over tangible personal property *incident to the ownership* of that property, except that it shall not include processing, or the sale of that property in the regular course of business;" § 57–4001(2), N.D.R.C.1943. [Emphasis added.]

A similar type of statute which included the qualification "incident to ownership" has been construed to require more than mere use or possession before the tax could attach. Chrysler Corporation v. City of New Orleans, 238 La. 123, 114 So.2d 579 (1959). However, this definition in § 57–40–01(2), N.D.C.C., was amended by the North Dakota Legislature in 1955 to read:

"* * * incident to the ownership *or possession* of that property, * * *." S.L.1955, ch. 331, § 1. [Emphasis added.]

This wording in the definition still remains in the current code section [now found at § 57-40.2-01(2), 1967 Supp., N.D.C.C.]. The definition of "purchase" found in § 57-4001(4), North Dakota Revised Code of 1943, read:

"4. 'Purchase' means any transfer, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, for a consideration; "

This definition in § 57-40-01(4), N.D.C.C., also was amended in 1955, and thus read:

"4. 'Purchase' means any transfer of title *or possession,* exchange, or barter, * * *." S.L.1955, ch. 331, § 2. [Emphasis added.]

This wording is still contained in the current code provision [§ 57-40.2-01(4), 1967 Supp., N.D.C.C.]. All of the provisions included in Chapters 57-39 and 57-40, N.D.C.C., have been carefully considered; however, only the provisions above are set forth as examples of the reason for this court's belief that the transactions involved under the contracts in the instant case are covered by the use tax provisions. The amendment adding the words "or possession" in 1955 indicates that the Legislature intended to broaden the application of the use tax provisions. In Curry v. United States, 314 U.S. 14, 17-18, 62 S.Ct. 48, 49, 86 L.Ed. 9 (1941), the United States Supreme Court stated:

" * * * we think that the contractors, in purchasing and bringing the building material into the state and in appropriating it to their contract with the Government, were not agents or instrumentalities of the Government; and they are not relieved of the tax, to which they would otherwise be subject, by reason of the fact that they are Government contractors. If the state law lays the tax upon them rather than the individual with whom they enter into a cost-plus contract like the present one, then it af-

fects the Government, like the individual, only as the economic burden is shifted to it through operation of the contract. As pointed out in the opinion in the *King & Boozer* case, by concession of the Government and on authority, the Constitution, without implementation by Congressional legislation, does not prohibit a tax upon Government contractors because its burden is passed on economically by the terms of the contract or otherwise as a part of the construction cost to the Government."

■ Based on the record in this case, we hold that the possession which Boeing had was sufficient for the use tax provisions to apply, notwithstanding the fact that title was in the United States. Accordingly, Boeing is liable for the use tax.

Additional issues involving the application of the use tax in this case are as follows:

1. Boeing contends that the use tax is contrary to § 175 of the North Dakota Constitution because it does not state the object of the tax.

2. Boeing contends that, because reenactment of the sales tax law failed on referendum in 1965, no sales tax could be enforced during the period of July 1, 1965, to April 1, 1967, and during this 21-month period the State Tax Commissioner claimed, pursuant to an Attorney General's opinion, that the use tax would take the place of the sales tax in most situations. [See N.D. Atty. Gen. Rep., covering July 1, 1964, to June 30, 1966, inclusive, at p. 403.]

■■ The constitutionality of the use tax will be considered first. This court has held, in Souris River Telephone Mutual Aid Corp. v. State, 162 N.W.2d 685 (N.D. 1968), in paragraph 2 of the syllabus:

"An enactment of the Legislature is presumed to be constitutional and such

presumption is conclusive unless it is clearly shown that the act is in contravention of the State or the Federal Constitution. * * * "

Section 175 of the North Dakota Constitution provided:

"No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied."

Boeing asserts that nowhere in the use tax statutory provisions found in Chapter 57–40, N.D.C.C., is there any language setting forth the purposes of and the allocation of the revenue derived from the use tax law, and thus that it is unconstitutional. The State argues, concerning unconstitutionality, that Boeing's complaint merely contends, and does not allege; that thus it is not a proper pleading and is purely argumentative, and therefore it should not be considered by this court. There are, however, sufficient factors in the instant case which do present the issue to this court. The constitutionality question was alluded to in the complaint, in the amended answer, and in the briefs of both parties; and it also was covered in oral argument. In Graven v. Backus, 163 N.W.2d 320, 322 (N.D. 1968), in paragraph 1 of the syllabus, this court stated:

"When an issue not raised by the pleadings is tried by the express or implied consent of the parties, such issue shall be treated in all respects as if it had been raised by the pleadings. Rule 15(b), N.D.R.Civ.P."

Pursuant to this court's interpretation of Rule 15(b), North Dakota Rules of Civil Procedure, this question will be considered by the court.

The trial court held that the use tax and the sales tax provisions were constitutional, based upon decisions in other States and because, under Article IV, § 89 of the North Dakota Constitution, only four Supreme Court judges, acting together, can declare a law unconstitutional. Thus the trial court concluded that it did not have the power to declare either the sales tax law or the use tax law unconstitutional. In State v. Klectzen, 8 N.D. 286, 78 N.W. 984, 986 (1899), this court stated:

" * * * the disposition to be made of the proceeds of taxes when collected depends wholly upon the terms of the law under which each is levied and collected. * * * The provisions of section 175 of the state constitution are clear and unambiguous, and the same are mandatory upon the legislature * * *."

See also State ex rel. Linde v. Packard, 32 N.D. 301, 155 N.W. 666, 669 (1915).

■ According to the Constitution of this State and the decisions of this court, it is clear that where the Legislature enacts a law assessing a tax it must designate the disposition to be made of the moneys collected under the taxing statute. The State's contention is that the Legislature has provided a method of disposition, which is contra to Boeing's contention, and, therefore, it will be necessary to review the history of the sales and use tax laws in order to determine which contention is supported by statutory provisions.

The use tax law originated in 1939, as Chapter 241, Session Laws of 1939, and included in its provisions, in § 11, is the following:

"All of the provisions of Section 5, * * * and * * * [Section] 17 * * * of Chapter 249 of the Session Laws of the State of North Dakota for the year 1937 *and any amendment or reenactment thereof shall apply to this act, all of which sections are by this reference incorporated herein* * * *." [Emphasis added.]

Section 17 of Chapter 249, Session Laws of 1937, provided that the Tax Commissioner shall transmit moneys collected from the sales tax:

"* * * to the State Treasurer to be deposited in the State Treasury to the credit of a fund to be known as the Retail Sales Tax Fund, which fund is hereby created and established."

Since this provision of the sales tax law was specifically incorporated by reference into the use tax provision set forth above, it is evident that the Legislature decided that the object of the use tax is the same as that of the sales tax and that all moneys shall be paid into the retail sales tax fund. The Legislature also outlined in some detail what allocation was to be made of the funds so collected (1937 S.L., Ch. 249, § 25). The 1939 Legislature placed a termination date of June 30, 1941, on the initial use tax law (1939 S.L., Ch. 241, § 2), but the 1941 Legislature, by amendment, removed the termination date (1941 S.L., Ch. 274, § 2), thus making the use tax law a permanent enactment. The 1941 amendment to the use tax provisions again incorporated by reference certain parts of the sales tax provisions found in Chapter 249 of the Session Laws of 1937, including § 17, which, as indicated above, provided that the moneys collected shall be deposited into the retail sales tax fund, which fund is allocated pursuant to another section of the sales tax law, pursuant to § 5, Chapter 274, Session Laws of 1941.

The next step in the history of the use tax was its inclusion in the North Dakota Revised Code of 1943 as Chapter 57–40. Section 57–4016, North Dakota Revised Code of 1943, states that the provisions of Chapter 57–39, dealing with the administration of the sales tax, would also govern the administration of the use tax unless these provisions conflicted with the use tax provisions found in Chapter 57–40. The foregoing provisions have undergone some changes from 1941 to 1963, but, for the most part, they involved minor changes in wording. See § 57–3932, N.D.R.C. 1943, and § 57–39–24, N.D.C.C. In 1963 the Legislature instituted a major change when it abolished the retail sales tax fund, by amending § 57–39–24, N.D.C.C., to provide that all moneys collected shall be paid into the State Treasury and credited to the general fund (1963 S.L., Ch. 200, § 23). It further provided that any balances that might exist in the retail sales tax fund, the state equalization fund, and the public welfare fund shall be paid over to the general fund on the effective date of the amendment (1963 S.L., Ch. 200, § 24).

The amendment abolishing the retail sales tax fund, which included a provision that thereafter all moneys collected shall be paid into the general fund, indicates that the Legislature did satisfy § 175 of the North Dakota Constitution by specifying the fund into which the moneys should be paid. The moneys from the general fund are used for many purposes and it has been held by other courts that the allocation of the proceeds of a state tax to the general fund is adequate to satisfy the constitutional provisions calling for a stating of the object of the tax. In re Diehr, 174 Okl. 300, 50 P.2d 725, 729 (1935); State Tax Commission v. Shattuck, 44 Ariz. 379, 38 P.2d 631, 634 (1934); In re Gross Production Tax of Wolverine Oil Co., 53 Okl. 24, 154 P. 362, 368–369 (1916).

■ Therefore, § 175 of the North Dakota Constitution has not been violated, since the provisions of the sales tax law regarding the purpose and disposition of the tax originally were incorporated by reference into the use tax provisions. The original sales tax statute provided that the moneys collected should be paid into a retail sales tax fund, but this fund then was abolished by amendment and the amending statute provided that the moneys collected should thereafter be paid into the general fund. This gives rise to the question whether the amendment to the sales tax pro-

vision which abolished the retail sales tax fund and provided that the moneys should be paid into the general fund also applied to the use tax provisions. The original language of the statute adopting the use tax contained a provision that:

"* * * *any amendment or re-enactment thereof shall apply to this act, all of which sections are by this reference incorporated herein, * * * *" S.L.1939, Ch. 241, § 11. [Emphasis added.]

Thus it clearly appears that the intent of the Legislature was that any amendments to the sales tax provisions which were incorporated into the use tax provisions should also apply to the use tax. Therefore, under the present statutory provisions, the moneys collected pursuant to the use tax provisions are paid into the general fund, the moneys from the general fund are used for many purposes, and there is a stated purpose and object, which satisfies § 175 of the North Dakota Constitution.

The next issue is whether the use tax could apply to purchases made within the State during the period from July 1, 1965, to April 1, 1967. The State contends that the use tax applies to purchases made at retail in North Dakota as well as to purchases made outside North Dakota during this 21-month period, whereas Boeing contends that the use tax applies only to personal property purchased outside North Dakota. The importance of this issue arises because the sales tax terminated on June 30, 1965, after the people of North Dakota, at a referral election, disapproved of the Legislature's reenactment of the sales tax. Pursuant to an Attorney General's opinion, the State then commenced to apply the use tax to in-State retail purchases. Boeing further contends that, since the use tax could not apply to personal property purchased inside North Dakota, it could not during the period from July 1, 1965, to April 1, 1967, then apply to personal property purchased outside North Dakota, because it would violate both the Equal Protection Clause and the Commerce Clause of the United States Constitution.

The State argues that the issue is not before the court because it was not properly pleaded by Boeing, and the State so alleges in its amended answer. The argument that this issue is not before the court can be answered in the same manner as the issue concerning the constitutionality of the use tax not being before the court, namely, that the issue was raised in the pleadings; was alluded to in the briefs; and was presented in the oral arguments; and thus, under such circumstances, the issue will be considered by this court. See Graven v. Backus, *supra.*

Having decided that the issue is before this court, it is necessary to analyze the history and details involved. Since the Retail Sales Tax Act first was enacted in 1935 (1935 S.L., Ch. 276), it has been amended and reenacted many times. The use tax first was enacted in 1939 (1939 S.L., Ch. 241), and was made permanent in 1941 when it was reenacted without a termination date (1941 S.L., Ch. 274).

It is the State's contention that the use tax law can and does stand by itself; that the use tax law was applied to purchases made at retail in North Dakota during the period from July 1, 1965, to April 1, 1967, and that this was done pursuant to an Attorney General's opinion issued as the result of an inquiry by a member of the North Dakota Legislature (see N.D. Atty. Gen. Rep. for the period of July 1, 1964, to June 30, 1966, p. 403). The Attorney General's opinion indicates that the provisions of the use tax law were not broad enough to include everything that the sales tax law covered. The State conceded in its brief that the use tax would not cover communication services, tickets and admissions, hotel and motel accommodations, and services to tangible personal property and, accordingly, it does not claim use taxes on those items for the period in question.

Boeing on the other hand, contends that the use tax is complementary or supple-

mental to the sales tax and thus, when there is no sales tax, it follows that there can be no use tax. Boeing further contends that the State conceded that the use tax did not cover property purchased in North Dakota prior to the lapsing of the sales tax on July 1, 1965. The State, however, vehemently disagrees with Boeing's contention and denies that the State has made any such concession. The State contends that, generally, it did not assess the use tax on these in-State purchases prior to July 1, 1965, because of the provision in § 57-40-03, N.D. C.C., which specifically exempted from the use tax any transactions on which sales tax was assessed. Thus, when the sales tax lapsed, the use tax would then apply to a number of transactions formerly covered by the sales tax. In addition, the State points out that there were several situations where the use tax had always applied prior to the lapsing of the sales tax, against property purchased in North Dakota. These situations arose when purchases were made at retail in North Dakota from North Dakota retailers who had imported the purchased items from another country. The retail sales tax could not be imposed in these situations because the Federal courts regard the sales tax as a violation of Article I, § 10, of the United States Constitution, which states, in part:

"No State shall * * * lay any Imposts or Duties on Imports or Exports * * *."

But taxing the use of the articles would not violate such constitutional provision.

 Where delivery and transfer of title or possession in this State by a retailer occurs at the same instant, then a retail sale has occurred. If the article has come into the State through interstate commerce, a sales tax could not be levied on the sale but conceivably a use tax could be and is levied in North Dakota. The use tax is not upon the operations of interstate commerce, but upon the privilege of the use after com-

merce is at an end. See Henneford v. Silas Mason Co., 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937).

 Generally a sales tax is imposed on purchases made inside the state and the use tax is imposed on purchases made outside the state and used inside the state, but, as the Utah Supreme Court said, in Ralph Child Construction Co. v. State Tax Com., 12 Utah 2d 53, 362 P.2d 422, 425 (1961):

"The use tax is imposed on any person storing, using or otherwise consuming tangible personal property in this state, purchased after July 1, 1937. Exempted from such use tax are all sales included in the sales tax, which is limited to sales made in this state. The sales tax and the use tax cover similar sales for the same general purposes, *but a sale covered by the sales tax must be made in this state, so usually the sale involved in a use tax is an out of state sale, but no statute expressly so provides.*" [Emphasis added.]

In the final analysis, whether the use tax can stand by itself is a question of legislative intent. Boeing strongly urges that the use tax is complementary or supplemental to the sales tax and that the use tax is not intended to duplicate the tax imposed by the Retail Sales Tax Act, and that, thus, the use tax could not apply to all purchases made at retail within North Dakota from July 1, 1965, to April 1, 1967, the period in which there was no sales tax in effect in North Dakota.

There are, however, a number of factors which discredit Boeing's theory that the use tax cannot stand alone. The sales tax law first was passed in 1935 (1935 S.L., Ch. 276), whereas the first use tax did not originate until 1939 (1939 S.L., Ch. 241). Then, in 1941, the use tax law was made permanent (1941 S.L., Ch. 274), whereas the sales tax law was not made permanent at that time. This would indicate that the

Legislature did not believe that the taxes were so closely connected that one could not remain in effect without the other. In addition, it should be noted that the use tax laws passed in 1939 and in 1941 contained sections providing that if any portion of the law should be found invalid, the remaining portion still would stand (1939 S.L., Ch. 241, § 13; 1941 S.L., Ch. 274, § 8). The use tax law passed in 1941 also included a provision that incorporated some sections of the sales tax law and "any amendment or re-enactment thereof" (1941 S.L., Ch. 274, § 5). The United States Supreme Court stated, in its decision in Henneford v. Silas Mason Co., *supra*, a case involving a sales tax and a compensating or complemental use tax, such as we have in the instant case:

" * * * If the sales tax were abolished, the buyer in Washington would pay at once upon the use. He would have no longer an offsetting credit. While the sales tax is in force, he pays upon the sale, and pays at the same rate." 300 U.S. at 584, 57 S.Ct. at 527.

The Iowa Supreme Court, in attempting to distinguish the sales tax and the use tax in the case of Herman M. Brown Company v. Johnson, 248 Iowa 1143, 82 N.W.2d 134, 142 (1957), quoted with approval from Paramount-Richards Theatres, Inc. v. State, 256 Ala. 515, 55 So.2d 812, 821 (1951), as follows:

"It is therefore necessary that these two acts should be construed *in pari materia*, giving to each its separate field of operation.

\* \* \* \* \* \*

"The technical means of confining the use tax to interstate sales or sales (purchases) made outside of the state for use in the state, is accomplished by exempting from the provisions of the use tax any property sold under such circumstances as would make the sale taxable under the provisions of the Sales Tax

Act. In other words, the Use Tax Act is drafted in such manner as to impose a use tax upon the use of tangible personal property within the state, at the same rate as the sales tax. In order to limit the use tax to interstate transactions, the Act is so worded as to exempt from the measure of the tax all retail sales of tangible personal property made within the state. * * * But for this provision, the Use Tax Act would have the effect of imposing an additional tax in the same amount as imposed by the Sales Tax Act. In this way, retail sales made within the state would be subjected to a double tax."

When the controversy in the instant case arose, North Dakota had a sales tax and a use tax, the purposes of which were to tax the retail purchases made in North Dakota, to tax the use of certain purchases made at retail in North Dakota, and to tax the use of purchases made at retail outside North Dakota. The purposes of the sales tax and the use tax obviously were to place an in-State purchaser on an equal footing with a person purchasing out of the State. There is a provision in the use tax law whereby any transaction on which sales tax is assessed will be exempt from the use tax provisions, but if there is no sales tax, then there will be no exemption and the use tax will apply to nearly everything that the sales tax formerly covered. Therefore, when the Retail Sales Tax Act was defeated by referral, the State properly imposed the use tax and, accordingly, the use tax applied to goods purchased in North Dakota during the period from July 1, 1965, to April 1, 1967.

It is the opinion of this court that the use tax would attach, as claimed by the State, except for the exemption in § 57–40–03(1) [now § 57–40.2–04(1), 1967 Supp.], N.D.C.C. Therefore, when the sales tax was defeated at the referral election, this exemption no longer applied and the use tax would attach to in-State purchases to the extent of its provisions, which, as con-

ceded by the State, were not quite so broad as the sales tax provisions. Accordingly, it is so held that such use tax provisions do attach to the purchases made under the contracts in the instant case during the period from July 1, 1965, to April 1, 1967.

The judgment of the trial court is reversed, and The Boeing Company is liable for the sales and use taxes on the purchase and use of materials for the projects in the instant case. Accordingly, Boeing is liable for sales and use taxes on:

1. Property and services procured by Boeing in North Dakota, pursuant to Letter or Definitized Contracts No. AF 04(647)–936 or No. AF 04(694–362;

2. All property which was procured by Boeing outside North Dakota, pursuant to these contracts alluded to in paragraph 1; and

3. All property which was purchased at retail by Boeing under Facilities Contract No. AF 04(647)–683, and as first used in North Dakota by Boeing.

TEIGEN, C. J., and STRUTZ, KNUDSON and ERICKSTAD, JJ., concur.