In the Matter of **DOUBLE H PRODUCTS CORPORATION, a New Jersey corporation, Bankrupt.**

Appeal of the **NATIONAL STATE BANK, ELIZABETH, N. J.**

No. 71–1206.

United States Court of Appeals, Third Circuit.

Argued March 16, 1972.

Decided May 31, 1972.

As Amended June 13, 1972.

William A. Dreier, MacKenzie, Welt & Dreier, Elizabeth, N. J., for appellant.

Jerome L. Merin, Asst. U. S. Atty., Newark, N. J., (Herbert J. Stern, U. S. Atty., by Frederick W. Klepp, Asst. U. S. Atty., James J. Kelly, New York City, Counsel, George Chernoff, Asst. Counsel, New Rochelle, Defense Contract Administration, Services Region, on the brief), for appellee.

Before MAX ROSENN and JAMES ROSEN, Circuit Judges and VAN ARTS-DALEN, District Judge.

## OPINION OF THE COURT

JAMES ROSEN, Circuit Judge.

This appeal is taken from a district court order granting recovery pursuant to a reclamation petition filed by the United States of America ("Government") against its prime contractor, Double H Products Corp. ("Double H") following an adjudication in bankruptcy after failure to confirm a plan of arrangement under Chapter XI of the Bankruptcy Act.

The bankrupt, Double H Products Corp., entered into a contract with the Government on June 13, 1968 for the construction of 1000 Mark 20 Missile stowage cradles essential to national security. The contract was subsequently amended by a "Progess Payments" addendum, under which title to all parts, materials, inventories, and work in progress vested in the United States as of the date of the contract and title to all like property thereafter acquired or produced vested in the Government upon acquisition or production.[1]

1. (d) TITLE. Immediately, upon the date of this contract, title to all parts; materials; inventories; work in progress; special tooling as defined in the clause of this contract entitled "Special Tooling"; special test equipment and other special tooling to which the Government is to acquire title pursuant to any other provision of this contract; nondurable (i. e., noncapital) tools, jigs, dies, fixtures,

The National State Bank, Elizabeth, New Jersey is the holder of a first lien represented by a valid security agreement executed by Double H Products (designated as "Debtor" in security agreement) on December 6, 1968, in the sum of $50,000. The bank was granted a security interest in

"(a)

 i. CONTRACT RIGHTS—All rights of the Debtor under the particular contracts assigned to the Bank from time to time including all money due or to become due to Debtor for performance of the assigned contracts.

\* \* \* \* \* \*

 iii. UNDERLYING GOODS AND MERCHANDISE—All interest of the Debtor, now existing or hereafter arising in goods, merchandise, or other inventory identified to an assigned contract."

On the same date, Double H assigned to the National State Bank all monies and claims for monies due and to become due to Double H under the contract and all amendments thereof between Double H and the Government. The Referee in Bankruptcy included in his memorandum opinion of January 21, 1970, a finding that "proper notice of said assignment of said contract was given by the National State Bank, Elizabeth, New Jersey to the proper authorities of the Department of the Navy of the United States of America, and financing statements as hereinafter described were duly filed" on December 9, 1968 in the office of the Secretary of State of New Jersey and in the office of the Clerk of Middlesex County.

On October 1, 1969, Double H filed a petition in the United States District Court for the District of New Jersey seeking an arrangement under Chapter XI of the Bankruptcy Act (11 U.S.C. § 701 et seq.). On October 21, 1969, the contract between Double H and the Government was terminated under the default clause of the "General Provisions" (Standard form 32) of the contract.

After Double H was adjudicated a bankrupt, the Government filed a petition for reclamation of certain "progress payment" inventory, i. e., inventory covered by the progress payment addendum to the contract. The bank contested the petition, claiming that it held a first lien on the property superior to the Government's claim of title since the bank had filed its financing statement under its security agreement with the bankrupt and the Government had not filed any document to protect its interest. The Referee concluded that the reclamation petition of the United States of America should be allowed, and entered a conforming order on February 10, 1970. On petition for review, the district court adopted and affirmed the decision of the Referee on January 14, 1971. The bank seeks a reversal.

 Although the bank attempts to frame the issue in terms of conflicting priorities,[2] we find for reasons hereinafter set forth that this question is not presented. The basic rule of contract law that a contract is governed by the

---

molds, patterns, taps, gauges, test equipment, and other similar manufacturing aids title to which is not obtained as special tooling pursuant to this paragraph; and drawings and technical data (to the extent delivery thereof to the Government is required by other provisions of this contract); theretofore acquired or produced by the Contractor and allocated or properly chargeable to this contract under sound and generally accepted accounting principles and practices shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor and allocated or properly chargeable to this contract as aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation.

2. "Since the vesting of title in the Government was no more than a security device, the question before this court therefore resolves itself into a problem of priorities between conflicting security interests, and the necessity of the Government's filing a financing statement in order to establish its priority over the Bank's claim." Appellant's Appendix, p. 14.

presumed intent of the parties, when applied to self-evident language in a contract, would seem to make this a case for easy disposition. However, the Bank challenges the apparent simplicity of the issue, by directing our attention to cases which were made primarily in the context of state and federal tax controversies, in which title vesting provisions were deemed insufficient to bar tax assessments against Government contractors. The issue is further complicated by Defense Department characterizations of Government methods of "financing" defense contractors.[3] In the final analysis, it is the force of the relevant contractual language employed, and the practical realities underpinning contracts made by an agency charged with the national defense, which determines the outcome.[4]

■ The Bank's position rests squarely on the proposition that the Government's title to the work inventory is a mere "paper title," intended for use as a type of security device. It contends that at most the Government receives a simple security title to protect its advances of cash made prior to the final delivery and acceptance of the completed stowage cradles, at which time a "sale" is effected. Contentions such as these have frequently been advanced over the years in attempts to escape the effect of title-passing provisions of fixed-price Government contract partial payment clauses. "At least to the extent of the partial payments, the courts have, in a variety of situations, almost unanimously sustained the provision as effecting a full and complete passage of title or ownership, and as not creating only a lien or security interest." Boeing Company v. United States, 338 F.2d 342, 345, 168 Ct.Cl. 109 (1964), cert. denied 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed.2d 269 (1965)[5]. Indeed, a title-passing provision standing alone and "without being incident to a partial payment provision" has been held by this Court to be effective as against the creditors of a bankrupt Government contractor. In re American Boiler Works, 220 F.2d 319 (3d Cir. 1955). Where unconditional title immediately vests, thus reducing the badges of a conventional loan arrangement that are present in a typical advance and progress payment situation the Bank's argument loses further vitality. We adopt the language of the court in Shepard Engineering Co. v. United States, 287 F.2d 737 (8th Cir. 1961), and apply it to the contract language involved in this dispute:

> "There is no ambiguity in the words of the contract that the material 'shall forthwith vest in the Government' and there is no reason why the contract should not be enforced by the courts." (287 F.2d at 741)[6]

---

3. See Defense Contract Financing Regulations, 32 C.F.R. §§ 163.1, 163.18. The office of the Secretary of Defense promulgates current, detailed regulations for the financing of defense production. The term "financing" as used in part 163 is inclusive of "Government guaranteed loans, advance payments and progress payments . . . necessary for both performance and termination purposes, to the extent authorized by law."

4. The United States has described the missile stowage cradles as essential to the national defense. The Bank has made no effort to dispute the importance of these items to the national security. Given this added dimension, the Government's right to reclaim incompleted items from a bankrupt defense contractor, where those items may be of critical importance to national defense, cannot be seriously questioned on the basis of non-compliance with state recording acts.

5. For the leading case on the construction of title-vesting provisions used in government contracts, see United States v. Ansonia Brass & Copper Co., 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910).

6. The Bank points to 10 U.S.C. § 2307 (c) and 10 U.S.C. § 7521, which give the Government a paramount lien for advance and progress payments, and argues that since the contract here called for immediate vesting of title, the Government cannot now avail itself of the senior lien status provided for in the aforementioned statutes. The simple answer is that it need not do so for in providing for full and absolute vesting

We take cognizance of the several state court decisions which have construed provisions in Government contracts in order to determine immunity for state tax purposes, but find them to be inconclusive for purposes of this case.[7] In Burroughs Corp. v. City of Detroit, 18 Mich.App. 668, 171 N.W.2d 678 (1969), defendants city and county argued that, notwithstanding government ownership of the tooling and inventory, the incidence of the tax as applied fell on the plaintiff defense contractor as "beneficial" owner and not on the government. This contention was rejected on the ground that the relevant tax statute under which the assessment was made authorized only an ordinary ad valorem tax on tangible personal property without providing for the taxation of intangible interests in such property. This holding was a reaffirmation of Continental Motors Corp. v. Township of Muskegon, 365 Mich. 191, 112 N.W.2d 429 (1961), in which the court rejected the United States Supreme Court's construction of Michigan's ad valorem tax as a use tax in City of Detroit v. Murray Corp. of America, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958). In *Detroit,* the court in a footnote assumed for the purposes of its decision that full title vested in the Government under a partial payments clause in a Government contract, and not just a bare security interest. However, it pointed to a series of Minnesota State tax cases where the assessments made against private contractors were upheld against claims of Governmental immunity, on the basis that the Government's title was in the nature of a security interest. However, upon close examination, it is apparent that the cases cited for comparison are not only factually distinguishable, but involve questions of real estate law, such as equitable conversion and mortgages, which make them sui generis.[8]

"[T]he fact that for certain general policy purposes partial payments would not be decisive of the question of title in the Federal Government, citing United States v. Allegheny, 322 U.S. 174, 182, 64 S.Ct. 908, 88 L.Ed. 1209 (1944). The decision rested on a determination of where equitable ownership lay, since the court was not so much concerned for tax purposes with the refinements of title as with the actual command over the property taxed. An examination of other contractual provisions convinced the court that the Government merely had bare legal title. The dissent argued that the majority holding not only totally ignored the self-evident purpose of the partial payments clause, but failed to recognize that "[T]he right of control retained by the government made its ownership far more than a bare legal title."

of title, the Government was as fully protected against subsequent attachments as if it had followed the paramount lien statutes. Nothing is present in the cited statutes to suggest that the Government is limited to those methods in protecting itself in its dealings with defense contractors.

7. In Boeing Co. v. Omdahl, 169 N.W.2d 696 (Supreme Court of North Dakota, 1969), a use tax assessment against property held by a Government contractor was challenged. In sustaining the assessment, the court stated: "Even though title vests immediately in the United States, that is not conclusive of ownership for tax purposes when it appears that the taxpayer retains the essential indicia of ownership" (169 N. W.2d at 707). In American Motors Corp. v. Kenosha, 274 Wis. 315, 80 N.W.2d 363 (1957), aff'd per curiam, 356 U.S. 21, 78 S.Ct. 559, 2 L.Ed.2d 578 (1958), a city personal property tax against aircraft work inventory used by a contractor for manufacture of aircraft parts under a Government contract was upheld, against a claim of immunity by virtue of a title vesting provision giving the Federal Government legal title. The Court observed that the question of ownership for tax purposes is one of local law, but also noted that state law

8. The distinction becomes obvious from the following language of the court in Petition of S. R. A., Inc., 213 Minn. 487, 7 N.W.2d 484 (1942):
"Here, under our law, there can be no doubt that S.R.A. has not only a contractual interest in the property, but also, by virtue of its contract, the equitable title thereto, a right of the same magnitude as if an outright grant had issued and a purchase money mortgage had been given to secure the unpaid balance." (7 N.W.2d at 490.)

may be considered as a form of contract financing and in the category of loans does not . . . put them in that category when it is necessary to ascertain the legal relationships they create, including the passage of title, in accordance with specific contract provisions . . ." Boeing Company v. United States, *supra,* 338 F.2d p. 352. In determining the legal relationships, where the terms of the contract providing for vesting title contain no suggestion that it is taken for security only, this court will not invite itself to rewrite the contract.

■ At the heart of the issue lurks a very substantial question of the relationship between the federal and state governments. The Bank argues that, although the earlier cases construed title-vesting provisions in Government contracts as conveying absolute title, these cases were decided before adoption by the states of the Uniform Commercial Code, and cites United States v. Allegheny, *supra,* for authority that "Federal statutes may declare liens in favor of the Government and establish their priority over subsequent purchasers or lienors irrespective of State recording acts. . . . Or the Government may avail itself, as any other lienor, of State recording facilities . . ." We do not read *Allegheny* to imply that, in the absence of federal statutes granting paramount liens, state recording statutes *must* be complied with by the Government. We hold that unless a federal statute requires recording with the State, the United States is not required to conform to State law in order to create a valid federal lien.[9]

■ That federal law controls the question herein was stated in unequivocal terms in United States v. Allegheny, *supra.*

"Procurement policies so settled under federal authority may not be defeated or limited by state law. The purpose of the supremacy clause was to avoid the introduction of disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls. The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles and liens which they create or permit, all present questions of federal law not controlled by the law of any State. (citations omitted)."

The Bank has attempted to cast itself as an innocent party without knowledge of the legal relationship created by the contract between the Government and Double H. It states that it filed its financing statement after a search revealed no other filed financing statements, but the evidence indicates, and the Referee in Bankruptcy so found, that the Bank was actually aware of the Government's contract with the bankrupt at the time of filing the financing statement. The Referee observed:

"There can be no question but that the Bank was, at the time of the filing of its Financing Statement in the Office of the Secretary of State of New Jersey, aware of the contract entered into between the bankrupt and the Government, for it gave to the Government timely notice of its in-

9. For a recent example of legislative reform involving tax liens, see the Federal Tax Lien Act of 1966, Title 26, §§ 6321, 6323, et seq., Nov. 2, 1966, 80 Stat. 1125–1147. In Senate Report No. 1708, the purpose of the bill was simply and succinctly stated:
"This bill is in part an attempt to conform the lien provisions of the internal revenue laws to the concepts developed in this Uniform Commercial Code. It represents an effort to adjust the provisions in the internal revenue laws relating to the collection of taxes of delinquent persons to the more recent developments in commercial practice (permitted and protected under State law) and to deal with a multitude of technical problems which have arisen over the past 50 years." U.S.Code Cong. and Admin.News, p. 3722.

terests under the Assignment of Claims Act, the bankrupt having assigned to it the proceeds of the contract. . . ."

The Bank's final argument falls with its initial premise. It stresses that its decision to make the loan to Double H was made after a search of the financing statement records in the office of the Secretary of State revealed no prior liens, and that, since the Government's title was merely a security device, filing was required to protect the Government's interest unless it complied with the statutory provisions governing advance or progress payments. The intended effect of this argument is to place the Government in an estoppel position. There is the additional contention that, after receiving notice of the Bank's succession under the assignment to the contractual rights of Double H, the Government mistakenly continued to make progress payments to the bankrupt. The Bank urges that the Government should be estopped from avoiding its own actions in disregard to the Bank's rights under the assignment, by retaining the fruits of its improper conduct. The Bank concedes that its claim under the Assignment of Claims Act (31 U.S.C. § 203) may be a matter for disposal by the Court of Claims, but insists that "the Government's conduct bears upon the decision to be made by this Court." The Government argues in its brief that "[i]f and when the bank institutes suit in the correct forum the evidence will indicate that after the assignment of the monies due under the contract to the bank and notice to the Government, the bank learned of the error in payment in January 1969, yet the bank did nothing to notify the Government, did nothing to prevent a second erroneous payment, except for an alleged telephone call to the Government without taking any further action to enforce its assignment. It therefore appears that the bank has slept on its rights to the detriment of the Government."

■ The issue raised by these arguments are proper matters for determination by the Court of Claims. We decline to review the actions of the parties subsequent to the assignment as the matter is not before us at this time. In order to remove any doubt concerning the Government's right under the contract to the reclaimed inventory, we cite the principle "which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided." United States v. Nashville, Chattanooga & St. Louis Ry., 118 U.S. 120, 125, 6 S.Ct. 1006, 1008, 30 L.Ed. 81 (1886); Acme Process Equipment Co. v. United States, 347 F. 2d 538, 171 Ct.Cl. 251, (1965) mod. 351 F.2d 656, 171 Ct.Cl. 251 (1965). For the same reason, the equitable principles of laches and estoppel have generally been rejected as defenses to actions by the United States for the recovery of property or funds to which it is legally entitled. Acme Process Equipment Co. v. United States, *supra;* Claremont Aircraft, Inc. v. United States, 420 F.2d 896 (9th Cir. 1969).[10] When the facts are more fully developed in the proper forum, it may appear that the Bank's casual efforts to secure its rights under the assignment may constitute sufficient culpability to preclude it from invoking the equitable doctrine of estoppel. Rayonier, Inc. v. Polson, 400 F.2d 909 (9th Cir. 1968); 28 Am.Jur.2d, Estoppel and Waiver §§ 79, 80, pp. 719, 720.

The judgment of the district court will be affirmed.

10. Cf. Walsonavich v. United States, 335 F.2d 96 (3d Cir. 1964).